**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**



U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 OCT -5  PM 4: 46

CLERK

BY_____
DEPUTY CLERK

ALMASOOD QURESHI, ALEXANDRE
DACCACHE, CARLOS ENRIQUE
HILLER SANCHEZ, PHILLIP
CALDERWOOD, JOSE ANTONIO
PIETRI, JOSE R. CASSERES-PINTO, and
TONGYI WANG, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

        v.

PEOPLE'S UNITED FINANCIAL, INC.,
as successor-in-interest to Chittenden Trust
Company; PEOPLE'S UNITED BANK;
MITCHELL SILBERBERG & KNUPP,
LLP, as successor-in-interest to
RICHARDSON & PATEL, LLP;
MITCHELL SILBERBERG & KNUPP,
LLP; DAVID B. GORDON; and DAVID
B. GORDON, A PROFESSIONAL
CORPORATION,

        Defendants.

Docket No.:

   2:18-cv-163

**COMPLAINT –**
**CLASS ACTION**
**JURY DEMAND**

## CLASS ACTION COMPLAINT

Plaintiffs Almasood Qureshi, Alexandre Daccache, Carlos Enrique Hiller Sanchez,

Phillip Calderwood, Jose Antonio Pietri, Jose R. Casseres-Pinto, and Tongyi Wang, on behalf

of themselves and all others similarly situated, allege as follows against People's United

Financial, Inc., as successor-in-interest to Chittenden Trust Company; People's United Bank

(together, "People's Bank"); Mitchell Silberberg & Knupp, LLP; Mitchell Silberberg &

Knupp, LLP, as successor-in-interest to Richardson & Patel, LLP ("MSK"); David B.

Gordon; and David B. Gordon, a Professional Corporation (together, "Gordon").

Langrock
Sperry
& Wool, PC

# I. **SUMMARY OF THE ACTION**

1.      Plaintiffs bring this action on behalf of a proposed class of 837 investors who invested more than $400 million in a series of related projects at the Jay Peak and Q Burke ski resorts in Vermont, and seek to hold Defendants People's Bank, Gordon, and MSK accountable for their knowing facilitation of a Ponzi-like scheme run through the resorts and masterminded by Ariel Quiros. The United States Securities and Exchange Commission ("SEC") filed a civil enforcement action against Quiros, his co-promoter, William Stenger, and the eight Jay Peak "limited partnerships" or "phases" that served as vehicles for Quiros's scheme on April 12, 2016, *see SEC v. Quiros, et al.*, No. 16-cv-21301-DPG (S.D. Fla.) (the "SEC Action"), charging  the defendants with violations of numerous provisions of the federal securities laws.  On April 13, 2016, the court in the SEC Action froze the Jay Peak accounts, including those maintained at People's Bank. On November 21, 2016, that court entered a preliminary injunction against Quiros, finding, among other things, that he had "committed many deceptive and manipulative acts across all . . . phases in furtherance of a scheme to defraud the EB-5 investors."[1] The State of Vermont also filed suit against Quiros, Stenger, and other alleged conspirators, and settled its claims in July 2018 for roughly $2 million.

2.      Quiros's scheme operated as follows: Quiros and Stenger would send potential investors offering materials for one or more of the eight Jay Peak and Q Burke projects, all of

---

[1] Preliminary Injunction, SEC Action (ECF No. 238), at 11-20, 25 ("Facts Common to All Phases"). The court in the SEC Action later entered a permanent injunction against Quiros based on these facts, prohibiting him from, among other conduct, violating Section 17(a) of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934. *See* Judgment of Permanent Injunction and Other Relief Against Defendant Ariel Quiros, SEC Action (ECF No. 398).

which were structured as limited partnerships. The offering materials for the projects were uniformly fraudulent in that they concealed from investors that Quiros did not intend to use investors' funds for the purposes specified in the offering materials, but instead planned to commingle and misappropriate investor funds to pay off earlier investors, cover shortfalls in other project accounts, as collateral for margin loans, and to line his own pockets.

3.      Once investors committed to a project, they sent their capital contributions to an escrow account designated for that project at People's Bank. People's Bank then released the funds to accounts controlled by Quiros at Raymond James & Associates, in violation of the terms of the offering materials executed by the investors, including investor escrow agreements with People's Bank.   Once the funds were under Quiros's control, Quiros commingled the investors' funds and diverted them to other projects and his own accounts.

4.      Quiros could not have executed his complex fraudulent scheme for almost eight years without People's Bank's knowing and substantial assistance. From the moment of Quiros's involvement with Jay Peak, People's Bank misdirected and commingled investor funds for Quiros in clear violation of both its escrow agreements with investors and the Jay Peak Limited Partnership Agreements, which Quiros and Stenger provided to People's Bank for each investment phase.  The escrow agreements and Limited Partnership Agreements were clear that People's Bank would release investor funds only to the investors themselves (in the event a refund was warranted) or to the particular limited partnership in which the investor had purchased shares.   Thus, the agreements authorized People's Bank to release Phase I investor funds *only* to the Phase I Limited Partnership, Phase II investor funds only to the Phase II Limited Partnership, and so on.  The Limited Partnership Agreements for Phases I-III also provided that investor funds would be deposited only in bank accounts, and for Phases I

and II, federally insured bank accounts.  Despite these restrictions, at Quiros and Stenger's direction, People's Bank transferred funds among the Jay Peak accounts designated for various projects, and to brokerage accounts at Raymond James, which was not a bank, designated for the same and different limited partnerships in which investors had purchased shares.

5.     Over the course of eight years, and despite its fiduciary duties to investors and federal regulations requiring it to know its customers, People's Bank also disregarded information from customers and at least one Jay Peak business associate about misrepresentations by Jay Peak's principals; executed millions of dollars in circular transactions indicative of money laundering; transferred investor funds among the accounts for purposes other than development of the specified projects; and kept the Jay Peak escrow accounts open until the SEC froze them in April 2016, despite knowing that the SEC and Vermont Department of Financial Regulation (the "Vermont DFR") were conducting investigations.

6.     Defendants Gordon and MSK also had actual knowledge of and substantially assisted the Jay Peak scheme.  Gordon and his law firm, MSK, were hired to represent Jay Peak and related entities in connection with an SEC investigation in June 2013. Gordon and MSK became aware of Quiros's misuse of funds no later than May 2014, when Gordon defended Quiros at an SEC deposition during which Quiros admitted to fraudulently diverting investor funds for his personal use and commingling funds between investment phases that were required by contract to be treated as distinct. But when the Vermont DFR opened an investigation into Quiros's dealings on or around December 2014, Gordon and MSK intentionally and actively concealed Quiros's admissions of fraud, and assured Vermont

regulators that the EB-5 Project arrangements gave "investors the absolute maximum amount of safety they could have received." By obstructing the Vermont DFR's investigation, Gordon and MSK joined in the conspiracy to mislead Jay Peak investors, and in consequence, Gordon and MSK are jointly and severally liable for the losses incurred by investors as a result of the conspiracy.

7. Plaintiffs bring this class action on behalf of all investors to recover their losses resulting from the Jay Peak and Q Burke scheme.

## II.  PARTIES AND RELEVANT NONPARTIES

### A.  The Parties

#### 1.  Plaintiffs

8. Plaintiff Almasood Qureshi is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Qureshi is a citizen of the Republic of India and a permanent resident of the State of Georgia. Mr. Qureshi entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Biomedical Research Park L.P. (Phase VII) on or about March 1, 2013, and has been damaged as a result of the Defendants' conduct alleged herein.

9. Plaintiff Alexandre Daccache is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Daccache is now a United States citizen residing in Florida. He was previously a citizen of Brazil. Mr. Daccache entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Penthouse Suites L.P. (Phase III) on or about August 13, 2010, and has been damaged as a result of the Defendants' conduct alleged herein.



10.     Plaintiff Carlos Enrique Hiller Sanchez is a natural person over the age of 21 and is otherwise *sui juris.* Mr. Hiller is a citizen of Venezuela who currently resides in Florida. Mr. Hiller entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Biomedical Research Park L.P. (Phase VII) on or about April 17, 2013, and has been damaged as a result of the Defendants' conduct alleged herein.

11.     Plaintiff Philip Calderwood is a natural person over the age of 21 and is otherwise *sui juris.* Mr. Calderwood is now a United States citizen, but was previously a citizen of the United Kingdom. Mr. Calderwood currently resides in Florida. Mr. Calderwood entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Hotel Suites Phase II L.P. (Phase II) on or about July 17, 2008, and has been damaged as a result of the Defendants' conduct alleged herein.

12.     Plaintiff Jose Antonio Pietri is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Pietri is a citizen of Venezuela and currently resides in Florida. Mr. Pietri entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Biomedical Research Park L.P. (Phase VII) on or about August 20, 2013, and has been damaged as a result of the Defendants' conduct alleged herein.

13.     Plaintiff Jose R. Casseres-Pinto is a natural person over the age of 21 and is otherwise *sui juris*. Dr. Casseres-Pinto is a citizen of Venezuela who resides in Smyrna, Georgia. Dr. Casseres-Pinto entered into a subscription agreement for the purchase of a Limited Partnership interest in Jay Peak Biomedical Research Park L.P. (Phase VII) on or about February 11, 2013, and has been damaged as a result of the Defendants' conduct alleged herein.

Langrock
Sperry
& Wool, er

14.     Plaintiff Tongyi Wang is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Wang is a citizen of Canada who resides in Montreal, Canada. Mr. Wang entered into a subscription agreement for the purchase of a Limited Partnership interest in Q Burke Mountain Resort, Hotel, and Conference Center L.P. (Phase VIII) on or about December 4, 2015, and has been damaged as a result of the Defendants' conduct alleged herein.

### 2.     Defendants

15.     Defendant People's United Financial, Inc., is a diversified financial services company. In January 2008, People's United Financial, Inc. merged with Chittenden Corporation, the bank holding company for the Chittenden Trust Company. At the time of the acquisition, Chittenden Corporation was the parent of Chittenden Trust Company, and Chittenden Trust Company became a wholly owned, direct subsidiary of People's United Bank. Chittenden Trust Company had previously undertaken to act as escrow agent for the investor funds for the EB-5 Projects. People's United Financial, Inc. is liable as successor-in-interest for the illegal conduct of the Chittenden Trust Company from the date of the acquisition through the date of the consolidation of the Chittenden Trust Company into People's United Bank as set forth below.

16.     People's United Bank is a federally chartered savings bank headquartered in Bridgeport, Connecticut and is a subsidiary of People's United Financial, Inc. In July 2008, the Board of Directors of People's United Financial, Inc., and the Board of Directors of People's United Bank approved a plan that had the effect of consolidating the acquired Chittenden entities into People's United Bank. The consolidation of the Chittenden entities and People's United Bank received regulatory approval on October 29, 2009, and Chittenden Trust Company merged into its parent corporation, People's United Bank, in or around

Langrock
Sperry
& Wool, llp

January 2009. At that time, all accounts and clients of Chittenden Trust Company became account of People's United Bank, which is thus the successor-in-interest to Chittenden Trust Company. At the time of the consolidation, People's United Bank's branch in Burlington, Vermont acted as escrow agent for the EB-5 Projects.

17.    Defendant Mitchell Silberberg & Knupp, LLP, a law firm, is a California limited liability partnership registered to do business in the State of New York. MSK's principal place of business is Los Angeles, California. MSK is the successor of the law firm Richardson & Patel, LLP.

18.    Defendant David B. Gordon is a resident of the State of New York, and through Defendant David B. Gordon, a Professional Corporation, is a partner at the MSK law firm. David B. Gordon is an attorney licensed in the State of New York.

### 3.    Relevant Nonparties

19.    Ariel Quiros is a citizen of the State of Florida, residing in Key Biscayne, Florida. Quiros masterminded the Jay Peak investment scheme, and is one of the targets of the SEC Action.

20.    Jay Peak, Inc. is a Vermont corporation with its principal place of business in Jay, Vermont. Jay Peak, Inc. operates the Jay Peak Resort in Jay, Vermont, the location of the first six EB-5 Projects for which Quiros and Stenger raised money.

21.    William Stenger is a citizen of the State of Vermont, residing in Newport, Vermont. He is a natural person over the age of 21 and is otherwise *sui juris*. Stenger was the Director, President, and CEO of Jay Peak, Inc. at all times relevant to Plaintiffs' claims.

22.    Raymond James & Associates, Inc. ("Raymond James") is a corporation organized and existing under the laws of the State of Florida. With the help of his then son-in-law and Raymond James Branch Manager, Joel Burstein, Quiros opened brokerage

Langrock
Sperry
& Wool...

8

accounts at Raymond James for each limited partnership and used those accounts to commingle and misappropriate investor funds. On June 30, 2017, the court in the SEC Action approved a settlement between the Receiver, Interim Class Counsel, and Raymond James (ECF No. 353). While this settlement was substantial and reduced the outstanding damages by providing for certain payments to investors and permitting the Receiver to finish, and hopefully, ultimately sell the project, the settlement did not make Plaintiffs whole and substantial damages remain.

23.     Mont Saint-Sauveur International, Inc. ("MSSI") is a Canadian firm which owned and operated Jay Peak from 1978 through mid-2008, when it sold Jay Peak to Quiros for further development with funds raised through the EB-5 Immigrant Investor Program—a federal program that offers immigrants permanent U.S. residency in exchange for investments in U.S. enterprises that create jobs in the country.

24.     North East Contract Services ("NECS") is a dissolved Florida limited liability company with its principal office located at 3460 Stallion Lane, Weston, Florida 33331. William J. Kelly, an associate of Quiros, was at all relevant times the sole member and manager of NECS.

25.     Q Resorts is a Delaware corporation with its offices in Miami, Florida. Q Resorts is the 100% owner of Jay Peak, Inc., and Quiros is the sole owner, officer, and director of Q Resorts. Q Resorts acquired the stock of Jay Peak, Inc., from MSSI in 2008. In January 2008, Quiros acquired control of Jay Peak Resort while negotiating a contract to purchase the stock of Jay Peak, Inc.

26.     Jay Peak Hotel Suites L.P. ("Phase I") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2006 and May 2008, Phase I

raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build a hotel. Phase I began offering and selling securities in the form of limited partnership interests in December 2006, when Jay Peak, Inc., was still owned by MSSI.

27.     Jay Peak Hotel Phase II L.P. ("Phase II") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between March 2008 and January 2011, Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house.

28.     Jay Peak Management, Inc. is a Vermont corporation, which is the general partner of Phases I and II. It is also a wholly-owned subsidiary of Jay Peak, Inc. At all times relevant to Plaintiffs'  claims, as well as those of the putative class, Stenger was the company's president.

29.     Jay Peak Penthouse Suites L.P. ("Phase III") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 55-unit "penthouse suites" hotel and an activities center.

30.     Jay Peak GP Services, Inc. is a Vermont corporation and the general partner of Phase III. At all times relevant to Plaintiffs' claims, as well as those of the putative class, Stenger was listed as the director, and was its only principal.

31.     Jay Peak Golf and Mountain Suites L.P. ("Phase IV") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2010 and November 2011, Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities.

Langrock
Sperry
& Wool

32.     Jay Peak GP Services Golf, Inc. is a Vermont corporation and the general partner of Phase IV. At all times relevant to Plaintiffs' claims, as well as those of the putative class, Stenger was listed as the director, and was its only principal.

33.     Jay Peak Lodge and Townhouses L.P. ("Phase V") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between May 2011 and November 2012, Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.

34.     Jay Peak GP Services Lodge, Inc. is a Vermont corporation and the general partner of Phase V. At all times relevant to Plaintiffs' claims, as well as those of the putative class, Stenger was listed as the director, and was its only principal.

35.     Jay Peak Hotel Suites Stateside L.P. ("Phase VI") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between October 2011 and December 2012, Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.

36.     Jay Peak GP Services Stateside, Inc. is a Vermont corporation and the general partner of Phase VI. At all times relevant to Plaintiffs' claims, as well as those of the putative class, Stenger was listed as the director, and was its only principal.

37.     Jay Peak Biomedical Research Park L.P. ("Phase VII") is a Vermont limited partnership with its principal place of business in Newport, Vermont. From November 2012 through April 2016, Phase VII raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility.

38.     AnC Bio Vermont GP Services, LLC ("AnC Bio") is a Vermont limited liability company and the general partner of Phase VII. At all times relevant to Plaintiffs' claims, as well as those of the putative class, its managing members were Quiros and Stenger.

39.     Phases I through VII are collectively referred to as the "Jay Peak Limited Partnerships." Each investor in Phases I through VII became a Limited Partner.

40.     Jay Peak Management, Inc., Jay Peak GP Services, Inc., Jay Peak GP Services Golf, Inc., Jay Peak GP Services Lodge, Inc., Jay Peak GP Services Stateside, Inc., and AnC Bio Vermont GP Services, LLC are collectively referred to as the "Jay Peak General Partners."

41.     Q Burke Mountain Resort, LLC ("Q Burke LLC") wholly owns Burke 2000, LLC, which in turn owns Burke Mountain Operating Company ("BMOC").

42.     Quiros is the 100% owner of Q Burke LLC.

43.     Q Burke Mountain Resort Hotel and Conference Center, L.P. (the "Q Burke Limited Partnership" or "Phase VIII") is a Vermont limited partnership with its principal place of business in East Burke, Vermont. Between June 2013 and April 2016, Phase VIII raised approximately $53 million from 106 investors through an EB-5 offering of Limited Partnership interests to build a hotel with 112 rooms, a conference center, and an outdoor pool.

44.     Each investor in Phase VIII was a Limited Partner.

45.     Each of the Jay Peak Limited Partnerships and the Q Burke Limited Partnership is referred to as a "Limited Partnership" or collectively as the "Limited Partnerships." Each of the Jay Peak General Partners and the Q Burke General Partner is referred to as a "General Partner" or collectively as the "General Partners."

Langrock
Sperry
& Wool,

12

### III.  JURISDICTION AND VENUE

46.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (codified at 28 U.S.C. §§ 1332, 1453, 1711–15). Diversity exists among the Plaintiffs and Defendants, hundreds of investors comprise the proposed Class, and the total amount in controversy exceeds $5 million. *See* 28 U.S.C. §§ 1332(d)(2), (d)(6).

47.     This Court has personal jurisdiction over Defendants People's Bank, Gordon, and MSK because these Defendants participated in tortious acts committed in Vermont and caused damage to investors in Vermont as alleged herein, and otherwise have sufficient minimum contacts with Vermont arising from the wrongful conduct committed in or directed at Vermont alleged herein.

48.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business, engaged in misconduct, and/or may be found in this District.

49.     All conditions precedent to this action have occurred, been performed, or been waived.

### IV.  FACTUAL ALLEGATIONS

#### A.     Overview of the Jay Peak Scheme

50.     Jay Peak is a Vermont ski resort.  MSSI, a Canadian firm, owned and operated Jay Peak from 1978 through mid-2008. MSSI began negotiating the sale of the Jay Peak resort with Quiros and Stenger in 2007, with the understanding that Quiros would further develop the resort with funds raised through the EB-5 Immigrant Investor Program—a federal

program that offers immigrants permanent U.S. residency in exchange for investments in U.S. enterprises that create jobs in the country.[2]

51.     Quiros and Stenger sent potential investors offering materials for one or more of the Jay Peak and Q Burke projects, all of which were structured as limited partnerships. Once investors committed to a project or "phase," they sent their capital contributions to an escrow account at People's Bank designated for that project. At Stenger's instruction, People's Bank released the funds to brokerage accounts controlled by Quiros at Raymond James, a brokerage firm. Quiros then commingled the investors' funds and diverted them to other projects and his own accounts. Quiros used investor funds to acquire the Jay Peak ski resort, pay his and a related entity's taxes, purchase a Trump Place condominium in New York City, and acquire Burke Mountain Resort, LLC—none of which was a permitted use of the funds under the offering materials. Quiros wrongfully commingled funds among all eight phases of the Jay Peak project and used at least $49 million of investor funds to benefit himself and related companies.

52.     From the time Quiros became involved with Jay Peak, People's Bank followed instructions given in violation of the escrow agreements it had entered into with investors and in violation of the terms of the Jay Peak offering materials and Limited Partnership Agreements. People's Bank's unquestioning acceptance of instructions from the perpetrators of the Jay Peak scheme resulted in the diversion and commingling of investor funds, and

---

[2] To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (depending on the location of the project) in an eligible commercial enterprise. Once the applicant has invested, he or she may apply for a conditional green card, which is valid for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply to have the conditions removed from his or her green card so as to live and work permanently in the United States.

delayed the discovery of the scheme by misleading investors and regulators as to the status of the partnerships and how investor funds were being applied.

53.     The offering materials for the projects set forth detailed descriptions of permitted uses of investor funds. The offering materials did not permit Quiros to commingle and misappropriate investor funds to pay off earlier investors, cover shortfalls in other project accounts, purchase securities as collateral for loans, or divert funds for his personal use. Ignoring the offering materials' description of the projects as separate "limited partnerships" or "phases," Quiros treated all investor funds as one pool of money with which he was building "one program within one resort," according to Quiros's own SEC deposition testimony, in which he also described the various EB-5 Projects as "one phase," making for a single and integrated scheme. Over $200 million of investor funds were used inconsistently with the requirements in the offering materials, resulting in substantial losses to the Jay Peak investors.

### 1.     The Early Phases: Quiros Misappropriates from Investors and Hides His Wrongdoing with Loans

54.     Quiros promoted the Jay Peak investments as eight separate "projects" or "phases," even though Quiros himself treated the investment program as "one program" and "one phase"—a single, integrated scheme.  The first six phases promoted by Quiros—Jay Peak Hotel Suites L.P., Jay Peak Hotel Suites Phase II L.P., Jay Peak Penthouse Suites L.P., Jay Peak Golf and Mountain Suites L.P., Jay Peak Lodge and Townhouses L.P., and Jay Peak Hotel Suites Stateside L.P.—purportedly raised funds to develop and expand the Jay Peak resort in Jay, Vermont. The seventh phase—Jay Peak Biomedical Research Park L.P.—purportedly raised funds to purchase land and develop a biomedical research facility in

Newport, Vermont. The eighth phase—Q Burke Mountain Resort, Hotel and Conference Center L.P.—purportedly raised funds to develop and expand the Burke Mountain hotel and ski area located in East Burke, Vermont.

55.     MSSI devised the plans for Phase I and Phase II, and began raising funds for Phase I in December 2006, before negotiating the sale to Quiros. By May 2008, MSSI had secured $17.5 million from 35 Phase I investors, through an EB-5 offering of limited partnership interests, to build a hotel.

56.     In June 2008, at Quiros's request, MSSI transferred the money it had raised ($11 million for Phase I and $7 million for Phase II) from People's Bank's accounts for Phases I and II to Raymond James accounts for Phases I and II, and then to accounts controlled by Quiros at Raymond James.  Quiros then transferred $7.6 million and $6 million out of these accounts to pay for the purchase of Jay Peak.  People's Bank knew that the Limited Partnership Agreements for Phases I and II provided that funds had to be disbursed to a federally insured bank, and that Raymond James was not a bank.

57.     Only $3.4 million remained in the account, but Quiros sought to cover up the shortfall by securing a $7.6 million loan from Raymond James. Raymond James agreed to lend $7.6 million to Quiros if Quiros used the resulting $11 million to purchase Treasury bonds that would serve as collateral for the loan. A loan of this sort—with securities as collateral—is known as a "margin loan" and is inherently very risky.

58.     Lenders typically permit lower maintenance margins for safer securities, such as Treasury bonds. A lower maintenance margin, in turn, allows for a larger loan. Quiros accordingly used Treasury bonds as collateral to minimize the maintenance margin on the margin loan, maximizing the amount of money he could borrow.

59.     Quiros also used the margin loan to hide the lack of funds in the Raymond James account. After the margin loan referenced above was extended, the Phase I account at Raymond James held Treasury bonds worth $11 million, matching the $11 million in cash that the account should have held. But the account also owed $7.6 million to Raymond James for the loan; of the $11 million from investors, only $3.4 million actually remained.

60.     Quiros adopted the same approach for the Phase II account at Raymond James on the same day. MSSI transferred $7 million of Phase II investor funds to Quiros's Phase II account, and Quiros diverted $6 million from the account to purchase Jay Peak. This left only $1 million of investor funds. On June 25, 2008, Quiros obtained a $6 million margin loan from Raymond James and purchased $7 million in Treasury bonds to collateralize the loan. As a result, the Phase II account contained $7 million in Treasury bonds (thus appearing to have the $7 million in investor funds that it should have had), but in fact it owed $6 million to Raymond James.

61.     These early-phase transactions violated contractual obligations to the investors because the Phase I and II Limited Partnership Agreements and offering memoranda enumerated the only permissible uses of investor funds. The offering memorandum for Phase I included a section entitled "Source and Use of Investor Funds" that detailed precisely how the Phase I hotel project would allocate the total pool of $17.5 million in investor funds among construction costs, furnishing and equipment, utilities and common areas, and developer fees. Similarly, the Phase II offering memorandum provided, in a paragraph entitled "Use of Proceeds," that Phase II investors' funds would be applied to (1) land acquisition, permits, and construction for the main hotel complex, and (2) "the costs of building the ancillary projects" such as an indoor water park, ice arena, and bowling alley. The source and

use of funds section of the offering materials for Phase II set forth a detailed breakdown of how the $75 million raised from Phase II investors would be allocated. The permitted uses of investor funds did not include purchasing Treasury bonds to secure a margin loan or purchasing Jay Peak from MSSI.

62.     From October 2008 until February 2009, Quiros continued to maintain substantial balances on margin loans secured by investor funds that were transferred from Phases I and II accounts at People's Bank to accounts at Raymond James, even though the offering materials prohibited encumbering partnership property without investor approval. By February 2009, the combined margin loan balances of the two accounts had reached $23.8 million.  People's Bank, at Stenger's direction, continued to transfer investor funds from the People's Bank Phases I and II escrow accounts to the Raymond James accounts, at which point the funds became collateral for margin loans not permitted under the offering materials.

## 2.     The Later Phases: Quiros Raises—and Misuses—More Money

63.     After Quiros purchased Jay Peak from MSSI, Quiros and Stenger assembled and disseminated standardized offering and subscription materials for all subsequent EB-5 Projects—Phases III through VIII—including offering memoranda, subscription documents, business plans, Limited Partnership Agreements, and investor escrow agreements with People's Bank. These documents were designed to conceal Quiros's fraudulent scheme and lull investors into believing that their funds would be used as represented in the offering materials. The offering materials—provided to every investor—described the particular project in which the investor would purchase shares, the purpose for which their investment would be used, and the benefits of investing in that project.

64.     The offering materials detailed how each Limited Partnership would allocate investor funds to pay for land acquisition, site preparation, and construction. Nothing in the

materials permitted the sponsors to commingle funds from different Limited Partnerships, apply funds from one Limited Partnership to another Limited Partnership, pay off prior investors, or cover Quiros's personal expenses. The materials expressly prohibited the sponsors from borrowing from or commingling investor funds, and, other than as specifically authorized, from acquiring any property with investor funds that did not belong to the Limited Partnership.

65.     The offering materials for each EB-5 Project represented that the project would generate an annual return once completed and operating. Further, the offering materials contemplated that the investors would receive cash from the sale of partnership properties or a fractional interest in the properties once the Limited Partnership's specific EB-5 Project was completed and permanent green cards were obtained.

66.     By signing the subscription agreements included in the offering materials, each investor affirmed that he or she had reviewed the materials and relied upon their contents.

67.     The Jay Peak promoters violated the terms of the offering materials by, among other things:

- **Taking out unauthorized, risky loans.** Quiros used approximately $32.5 million from Phase III, approximately $15.8 million from Phase IV, and approximately $5.6 million from Phase V to make payments on a margin loan related to Phase I and Phase II funds. And in a separate transaction on February 24, 2012, Quiros used approximately $5.8 million from Phase VI and approximately $16.6 million from Phase V to make payments on the same margin loan.

- **Impermissibly commingling funds.** On October 3, 2011, Stenger authorized a transfer of $49,000 from the People's Bank Phase III account to the People's Bank

Phase I account, which People's Bank executed. Between October 2013 and June 2015, approximately $1,213,626 was wired from Phase VIII to Jay Construction Management, Inc., and approximately $3.4 million to NECS. Those funds were used to pay expenses not associated with Phase VIII, including construction expenses associated with Phases V and VI, or were commingled with funds from the earlier Limited Partnerships. People's Bank knew that these transfers violated the terms of their escrow agreements with investors, as well as the Limited Partnership Agreements provided to investors.

- **Using investor funds for personal expenses.** On April 12, 2013, Quiros transferred $3 million in Phase VII investor funds to his wholly-owned company GSI of Dade County, Inc. ("GSI"). Six weeks later, on May 30, 2013, Quiros used $2.2 million of that money to buy a luxury condominium at Trump Place in New York City.

- **Using investor funds to pay taxes.** Between March and June of 2013, Quiros transferred $4.2 million in Phase VII investor funds to pay corporate taxes to the IRS and the State of Vermont for Jay Construction Management, Inc.—even though Phase VII had no responsibility for those tax liabilities.

68.    An accountant for the SEC, Mark Dee, testified that he had documented repeated instances in which investor funds from each of the Jay Peak EB-5 projects were commingled with funds from other Jay Peak EB-5 projects. Declaration of Mark Dee, *SEC v. Quiros*, No. 1:16-cv-21301 (S.D. Fla. Apr. 25, 2016), ECF No. 66-1 ¶ 7. All told, Mr. Dee documented commingling of more than $350 million of investor funds, concluding that such

funds "frequently flowed in a circular and roundabout manner between various accounts and entities." *Id.* ¶¶ 7-8.

69.     Aided by People's Bank, Quiros's misappropriation and misuse of investor funds continued through each of the eight EB-5 phases at issue in this case. Investor funds for each phase were pledged as collateral for margin loans, even though the offering materials specifically prohibited the projects' General Partners from encumbering or pledging investor funds as collateral without the investors' express consent. None of the offering materials for later EB-5 projects disclosed that any misuse had occurred in connection with earlier projects.

**B.     People's Bank's Knowing Participation in the Conspiracy to Defraud**

**1.     People's Bank Breaches Its Obligations Arising from Escrow Agreements with Investors**

70.     People's Bank acted as the escrow agent for the investments in the Jay Peak Limited Partnerships.

71.     People's Bank was a party to an escrow agreement with each investor. Under the terms of the escrow agreements, People's Bank was to hold each investor's principal investment of $500,000, as well as an additional "administrative fee" payment of $25,000 to $50,000, in an escrow account designated for the Limited Partnership in which the investor had purchased a partnership unit, and disburse those funds only as specified in the escrow agreements.

72.     People's Bank's escrow agreements with investors in Phases I through VIII set forth clear restrictions on the distribution and release of investor funds.  The escrow agreements and offering materials provided that People's Bank would release the escrowed funds only to the specific Limited Partnership in which the investor had purchased an interest, or to the investor in the event a refund was warranted. The agreements did not authorize

Langrock
Sperry
& Wool, llp

21

People's Bank to release escrowed funds to Limited Partnerships other than the one in which the individual investors had purchased an interest, or for any other use. The stated purpose of the escrow arrangements was to hold investor funds "for the benefit" of investors.

73.     The Limited Partnership Agreements provided to People's Bank were clear that People's Bank would only release investors' funds to the particular Limited Partnership in which the investors had purchased an interest or to the investors themselves, and further prohibited the General Partner from borrowing or commingling Limited Partnership funds without investors' consent. The Limited Partnership Agreements for Phases I and II also provided that the General Partner would deposit and hold investor funds in a federally insured bank account or accounts. The Phase III agreement similarly provided that such funds would be deposited in a bank account or accounts.

74.     As a brokerage firm, Raymond James is neither a bank nor is FDIC-insured. Thus, with respect to these initial phases, the offering materials expressly prohibited the transfer of investor funds from the Phases I-III escrow accounts to any account at Raymond James. People's Bank had knowledge of this restriction as the offering materials, and specifically the Limited Partnership Agreements, were expressly referenced in the escrow agreements.

75.     None of the agreements provided to investors authorized People's Bank to release escrowed funds to any Limited Partnership other than the one in which the individual investors had purchased interests, or for any other use. In fact, the Limited Partnership Agreements prohibited the General Partner from borrowing or commingling Limited Partnership funds without investors' consent. The escrow agreements did not authorize People's Bank to receive deposits of investor funds from Jay Peak and return those funds to

Jay Peak in a circular transaction, or to transfer funds to limited partnerships other than the specific limited partnership in which the limited partner had invested. Nor did the escrow agreements authorize Jay Peak to hold funds received from investors while Quiros or Stenger attempted to determine to which limited partnership to commit those funds. Rather, the stated purpose of the escrow arrangements was to hold investor funds "for the benefit" of investors.

76.     People's Bank appeared to be a disinterested third party—a neutral escrow agent—owing fiduciary duties to investors, but did not comply with its obligations. According to its representative's deposition testimony, People's Bank "considered the [escrow] account belonging to Jay Peak, not to the investor . . . [People's Bank] considered the investors to be a third party." People's Bank acknowledged that investor funds were being held in escrow "for the benefit of the investors" and "that's what the Escrow Agreement says"; yet People's Bank also admitted that "we really didn't consider[] it under those terms. . . . We considered, once it went into the Jay Peak account, it belonged to Jay Peak."

77.     People's Bank breached its obligations under the escrow agreements by disbursing Phase I–III funds to brokerage accounts at Raymond James. Under the offering materials for those phases, People's Bank could only transfer those funds to bank accounts, but the Raymond James accounts that received the transfers from People's Bank were not bank accounts.

78.     On June 16 and 17, 2008, in preparation for closing the sale of Jay Peak to Quiros, People's Bank, at the direction of MSSI, transferred $11 million in investor funds from the Phase I account at People's Bank to the Phase I account at Raymond James. On June 20, 2008, People's Bank, at the direction of Stenger, transferred $7 million in investor funds from the Phase II account at People's Bank to the Phase II account at Raymond James. MSSI

Langrock
Sperry
& Wool, LLP

23

then transferred the money in Phase I and Phase II accounts that it had opened at Raymond James for purposes of the closing of the sale of Jay Peak to Quiros, to Quiros's Phase I and Phase II accounts at Raymond James. Because the Raymond James accounts were brokerage accounts, these transfers violated the provision in the Phase I and II Limited Partnership Agreements requiring that investor funds be held only in federally insured bank accounts. Similarly:

- On September 4, 2008, People's Bank released $1 million from the Phase II Escrow Account at People's Bank to the Phase II account at Raymond James.

- On September 15, 2008, People's Bank released $3 million from the Phase II Escrow Account at People's Bank to the Phase II account at Raymond James.

- On September 22, 2008, People's Bank released $1.5 million from the Phase II Escrow Account at People's Bank to the Phase II account at Raymond James.

79.    People's Bank also released funds held for investment in one phase of an EB-5 Project to brokerage, escrow, or checking accounts designated for *another* EB-5 Project phase. For example:

- On July 1, 2008, People's Bank released $1 million from the Phase I escrow account at People's Bank to the Q Resorts account at Raymond James.

- On July 1, 2008, People's Bank released $600,000 from the Phase II escrow account at People's Bank to the Q Resorts account at Raymond James.

- On December 31, 2010, People's Bank released $9 million from a Phase I checking account at People's Bank to the Phase II escrow account at People's Bank and then transferred these funds to the Phase II account at Raymond James. A bank employee reacted to this transaction as being extraordinary, openly questioned it, and sought and secured approval of the transfer from her manager.

- On October 3, 2011, People's Bank released $49,000 from a Phase III account at People's Bank to the Phase I investor checking account at People's Bank.

- On February 23, 2012, People's Bank released $62,000 from a Phase I account at People's Bank to the Phase II investor checking account at People's Bank.

Langrock
Sperry
& Wool,

80.     People's Bank knew that these and other transfers were improper because the escrow agreements for each Limited Partnership required that upon release of an investor's capital contributions to a Limited Partnership associated with an EB-5 Project, the investment was to be "immediately and irrevocably" committed to that same project. Likewise, the offering materials for each Limited Partnership required that People's Bank establish a reserve account from which to disburse funds to satisfy the obligations of that Limited Partnership.

81.     A People's Bank executive has admitted that the bank understood that these transfers were in breach of the escrow agreements, as those agreements prohibited the bank from commingling funds that had been earmarked for particular construction phases. That recognition, however, did not prevent People's Bank from facilitating the commingling of funds in violation of its duties to investors. And by knowingly failing to disclose the ongoing fraud, People's Bank deceived and injured investors in the Jay Peak enterprise.

### 2.     People's Bank Knowingly Abets Fraudulent Conduct

82.     The improper transfers summarized above alerted People's Bank to Quiros and Stenger's ongoing fraudulent conduct. MSSI and Stenger directed transfers that People's Bank carried out despite knowing that the transfers violated its own escrow agreements with investors and the Limited Partnership Agreements provided to investors. As noted above, the limited partnership agreements did not contemplate transfers of funds to non-bank institutions, transfers of funds earmarked for one phase to another phase, or to serve as collateral for loans, or for any purpose other than the contractually mandated transfer to accounts designated to fund the particular phase of the EB-5 Projects that was the subject of the investment.  Moreover, People's Bank's own escrow agreements prohibited the Bank from transferring investor funds to any Limited Partnership other than the one in which the

Langrock
Sperry
& Wool,

investor had contracted to purchase shares. People's Bank nevertheless carried out such transfers knowing that they were wrongful, and that the limited partners were being misled as to the use of their funds, the legal separation between the limited partnerships, and the security of their investments.

83.     As early as 2010, People's Bank knew that investors had accused Jay Peak of misrepresentations and of improperly directing the release of escrowed funds before the investors' applications had been approved. For example, in a written communication sent to People's Bank in March 2010, an investor stated that Jay Peak was misleading investors and requested a refund. Stenger then instructed People's Bank to release the funds to the investor without further investigation. People's Bank considered the investor's accusation a red flag that the bank should have investigated to determine whether criminal conduct may have been occurring. Nevertheless, People's Bank did not undertake such an investigation, and continued to carry out transfers at the direction of Jay Peak operatives.

84.     In May 2010, an investor wrote to People's Bank:

> Kindly refer to my [] number of requests for over a period of more than one year held by you in the escrow account. I am under a lot of pressure from the persons from whom I borrowed the money. Now a stage has come when I don't have money to give food to my small children. My younger daughter is over 2 years and she remains hungry as I am not able to give my three children food properly. Their health is fast deteriorating and I am very much worried that nothing should happen to them due to this situation. On the humanitarian request and kindly come to my rescue to save my kids life, kindly refund my money immediately . . . . I am not able to borrow food for my children any longer. Kindly refund my money immediately.

The bank's employees regarded this communication as "extraordinary" and "striking." Still, the bank continued to execute the transfer orders it received from Stenger without question.

85.     People's Bank also knew that commingling among the various EB-5 Projects

26

was taking place. For example, and in addition to the examples cited above, *see, e.g.,* ¶¶ 67, 78-79, *supra*, on October 3, 2011, Stenger requested a transfer of $49,000 from the People's Bank Phase III account to the People's Bank Phase I account. And on February 23, 2012, Stenger authorized a transfer of almost $62,000 from the People's Bank Phase I account to the People's Bank Phase II account. People's Bank carried out both of these transfers without conducting any meaningful inquiry or securing any investor consent.

86.    In addition, People's Bank learned directly from another well-informed business that Jay Peak was engaged in suspicious activity. In February 2012, Rapid Visa, a principal sales agent for the Jay Peak project, warned People's Bank via email that it had terminated its relationship with Jay Peak because Rapid Visa no longer had confidence in the accuracy of the financial representations, financial status, or disclosures of Jay Peak. Rapid Visa further informed People's Bank that it should not use or rely upon any documents that it received from Rapid Visa regarding Jay Peak. People's Bank recognized that Rapid Visa's communication was a red flag which required investigation into suspicious activity. But when investors contacted People's Bank to express their concerns about Jay Peak's status as an EB-5 Project, representatives of People's Bank reassured them that Jay Peak was in good standing. People's Bank engaged in these communications without investigating or inquiring into the concerns Rapid Visa had expressed.

87.    In violation of the escrow agreements, People's Bank also received and transmitted millions of dollars of wires in circular transfers without any apparent legitimate purpose. The transfers served to conceal the use of investor funds from one phase to pay down margin loans connected with another phase. For example, on March 4, 2014, Quiros transferred approximately $18.2 million from a Phase VII account at Raymond James to a

Langrock
Sperry
& Wool, llp

27

Phase VII operating account People's Bank. Then, at Quiros's direction, People's Bank transferred the funds to a Jay Construction Management, Inc. account at Raymond James. Quiros subsequently directed that the money be transferred out of the Jay Construction Management, Inc. account at Raymond James to pay off a margin loan related to Phases V and VI.

88.     The use of investor funds to pay off a margin loan contributed significantly to the Phase VII project shortfalls. Unexplained movements of money from account to account—as reflected in the movement of funds to pay off the Jay Peak margin loan—is a known hallmark of money laundering.

89.     Federal law requires banks, including People's Bank, to recognize suspicious activity. Banks are required under federal law to know their customers and understand their banking behavior. Banks must develop a customer due diligence program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer. Banks and their personnel also must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the Federal Financial Institutions Council's Bank Secrecy Anti-Money Laundering Examination Manual, including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the accountholder's business; (4) transfers of funds among related accounts; (5) loans that are secured by account deposits; (6) loans that lack a legitimate business purpose, provide the bank with excessive fees for assuming little or no risk, or obscure

Langrock
Sperry
& Wool, llc

movement of funds; and (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities.

90.     People's Bank also had an obligation under its own policies, industry standards, and regulatory guidelines to refrain from participating in suspicious transactions.

91.     People's Bank did not take appropriate action in spite of these and many other red flags, but continued to enable the Jay Peak fraud on a daily basis, placing hundreds of millions of investor dollars under Quiros's unfettered control. People's Bank was motivated to continue transferring escrowed funds in violation of its contractual and fiduciary duties to investors, and in spite of its knowledge that those transfers were facilitating continuing wrongdoing, in order to preserve its role as banker to the Jay Peak enterprise.

### C.     Gordon's and MSK's Knowing Participation in the Conspiracy to Defraud

92.     David B. Gordon and his law firm, MSK (the successor to Richardson & Patel, LLP ("R&P")), joined in Quiros's fraudulent scheme, injuring Plaintiffs and the other Jay Peak investors. On or about June 5, 2013, Jay Peak, Inc., Q Resorts, Inc., Jay Construction Management, Inc. and GSI retained Gordon, then at R&P, in connection with their responses to subpoenas issued by the SEC.

93.     Gordon defended Quiros when the SEC deposed him on May 22, 2014. In that deposition, the SEC questioned Quiros specifically about his use of investor funds, phase-by-phase. Repudiating the notion of separate projects, Quiros testified to treating all investor money the same, describing investor Phases I–VI as "one phase." *See* May 22, 2014 SEC Dep. at 94:2–4. Quiros claimed it was "one program within one resort." *Id.* at 95:1–2.

94.     Quiros testified that "once [an individual] invests, it is now my money. It is totally my money." *Id.* at 90:3-4. Quiros further testified that once investor funds were

Langrock
Sperry
& Wood,

29

transferred to a Quiros-controlled account, he could "do whatever I want" with them. *Id.* at 128:22–23.

95.     As a specific example of commingling among phases, Quiros admitted in Gordon's presence to applying $18.2 million of investor funds derived from a Phase VII account at People's Bank toward paying off a $18.9 million margin loan related to Phases V and VI. *See id.* at 228–34.

96.     During the course of Gordon's representation, Quiros's banking irregularities came to the attention of the Vermont DFR. In conjunction with the Vermont EB-5 Regional Center, which ran EB-5 investment programs for the State of Vermont, the Vermont DFR was authorized to allow or disallow future EB-5 investment in Jay Peak and Q Burke. Quiros needed a continuing infusion of such new investor funds to pay construction expenses incurred on incomplete older projects. That need, in turn, required him to conceal the commingling and wrongful diversion of investor funds.

97.     On or about December 19, 2014, Gordon met with officials at the Vermont DFR to explain the irregularities in question, and later summarized the meeting in a letter to the Vermont DFR dated February 27, 2015.

98.     Despite personal knowledge of Quiros's admissions during his SEC deposition, including the treatment of investor funds as his own personal spending money, in the February 27, 2015 letter Gordon falsely labeled Quiros's movement of investor funds between People's Bank and Raymond James as a mechanism to create the "maximum amount of safety [investors] could have received." Gordon and MSK knew this assertion to be false— Quiros, defended by Gordon, had previously admitted under oath that money was moved

between these accounts to get the money into its "new owner's hand, which is Ariel Quiros[.]" *Id.* at 128:21.

99.     Gordon prepared the February 27, 2015 letter to convince the Vermont DFR that any future investment in Phases VII and VIII would be handled legally and in conformance with regulatory requirements. In fact, he knew that they would not be handled as such.

100.     Because Gordon knowingly obstructed the Vermont DFR's investigation, the Vermont DFR allowed the Phase VII and VIII offerings to go forward. Had Gordon responded candidly to the Vermont DFR's inquiries, instead of responding with subterfuge, misstatements, and concealment of the true facts, the Vermont DFR would have disallowed further investment offerings relating to the EB-5 Projects.

101.     As a result of Gordon's and MSK's wrongful concealment of the fraudulent scheme, Quiros was able to misappropriate substantially all the funds invested in Phases VII and VIII.

V.     **PLAINTIFFS' INVESTMENTS IN THE JAY PEAK SCHEME**

102.     Plaintiffs Qureshi, Daccache, Hiller, Calderwood, Pietri, Casseres-Pinto, and Wang each sustained damages as a result of their investments in the Jay Peak and Q Burke scheme. From the early stages of Quiros's involvement in Jay Peak, Quiros and Stenger misdirected investor funds held in escrow at People's Bank to accounts at Raymond James, and then used those funds, *inter alia*, to pay off margin loans related to other phases, *see ¶¶* 57-62, 67, 87, *supra*; cover expenses from prior phases, *see ¶¶* 67, 87, *supra*; and fund Quiros's personal businesses and accounts, *see ¶¶* 51, 67, *supra*. Though Quiros promoted the investments to Plaintiffs as separate projects, once invested, Plaintiffs' funds were

Langrock
Sperry
& Wool,

31

commingled and treated as one pool of money—as investments in "one phase." *See* ¶ 93, *supra*. The details of each Plaintiff's investment follow.

### *Almasood Qureshi*

103. On or around March 1, 2013, Mr. Qureshi entered into a subscription agreement for the purchase of a Limited Partnership interest in Phase VII.

104. On March 12, 2013, Mr. Qureshi executed an investor escrow agreement between himself and People's Bank.

105. In March, 2013, Mr. Qureshi paid approximately $525,000 to the Phase VII escrow account at People's Bank for the purchase of one Limited Partnership unit in Phase VII, of which $25,000 went toward an administrative fee.

106. In making this investment, Mr. Qureshi reviewed and relied on the offering materials for this investment.

107. The business plan for Phase VII stated that Mr. Qureshi's investment would be used to build a "world class" biomedical research facility with clean rooms, a sterile environment, and high-tech equipment for scientists' research efforts.

108. The Limited Partnership Agreement for Phase VII stated that: (a) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (b) investors' funds would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership; (c) the General Partner would not borrow the funds of the Limited Partnership; and (d) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

Langrock
Sperry
& Wool, ..

109.    Nowhere did the offering materials provided to Mr. Qureshi disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

110.    In March 2013, Phase VII issued a certificate to Mr. Qureshi to evidence his purchase of a Limited Partnership interest in Phase VII.

111.    On or around April 15, 2016, Mr. Qureshi learned for the first time of the SEC Action and that Phase VII in which he invested was part of a Ponzi scheme.

112.    Mr. Qureshi has been damaged in that all or a portion of the funds that he invested in Phase VII were misused, commingled, and used as collateral for margin loans.

113.    There are no material differences between these Defendants' actions and practices directed to Mr. Qureshi and their actions and practices directed to the Class.

### *Alexandre Daccache*

114.    On or about July 13, 2010, Mr. Daccache entered into a subscription agreement for purchase of a Limited Partnership interest in Phase III.

115.    On July 13, 2010, Mr. Daccache executed an investor escrow agreement between himself and People's Bank.

116.    On or about July 28, 2010, Mr. Daccache paid $550,000 to the Phase III escrow account at People's Bank d/b/a Chittenden Trust Company for the purchase of one Limited Partnership unit in Phase III, of which $50,000 went toward an administrative fee.

117.    In making this investment, Mr. Daccache reviewed and relied on the offering materials for this investment.

118.    The business plan for Phase III stated that the investment made by Mr. Daccache would be used to build the Penthouse Phase III suites.

Langrock
Sperry
& Wool, LLP

119.     The Limited Partnership Agreement for Phase III stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts at "with such bank or banks as shall be determined by the General Partner" in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

120.     Nowhere did the offering materials provided to Mr. Daccache disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

121.     On October 5, 2010, Phase III issued a certificate to Mr. Daccache to evidence his purchase of a Limited Partnership interest in the Limited Partnership.

122.     Mr. Daccache first learned that the SEC was investigating the Jay Peak and Q Burke Projects in November 2015, but learned for the first time of the SEC Action and that Phase III was a "Ponzi" scheme in April 2016.

123.     Mr. Daccache has been damaged in that all or a portion of the funds that he invested in Phase III were misused, commingled, and used as collateral for margin loans.

124.     There are no material differences between these Defendants' actions and practices directed to Mr. Daccache and their actions and practices directed to the Class.

### *Carlos Enrique Hiller Sanchez*

125.     On or about April 17, 2013, Mr. Hiller made a refundable deposit of $10,000 into an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VII.

Langrock
Sperry
& Wool, P.C.

34

126.    On or about May 14, 2013, Mr. Hiller entered into a subscription agreement for purchase of a Limited Partnership interest in Phase VII.

127.    On or about May 14, 2013, Mr. Hiller executed an investor escrow agreement between himself and People's Bank, and paid $540,000 into an escrow account at People's Bank, which was the balance of the purchase price and the administrative fee for one Limited Partnership unit in Phase VII.

128.    In making this investment, Mr. Hiller reviewed and relied on the offering materials for this investment.

129.    The business plan for Phase VII stated that Mr. Hiller's investment would be used to build a "world class" biomedical research facility with clean rooms, a sterile environment, and high-tech equipment for scientists' research efforts.

130.    The Limited Partnership Agreement for Phase VII stated that: (a) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (b) investors' funds would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership, which would be controlled by the General Partner; (c) the General Partner would not borrow the funds of the Limited Partnership; and (d) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

131.    Nowhere did the offering materials provided to Mr. Hiller disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

132.    On May 17, 2013, Phase VII issued a certificate to Mr. Hiller to evidence his purchase of a Limited Partnership interest in Phase VII.

Langrock
Sperry
& Wool,

35

133.    On or around April 15, 2016, Mr. Hiller learned for the first time of the SEC Action and that Phase VII in which he invested was part of a Ponzi scheme.

134.    Mr. Hiller has been damaged in that all or a portion of the funds that he invested in Phase VII were misused, commingled, and used as collateral for margin loans.

135.    There are no material differences between these Defendants' actions and practices directed to Mr. Hiller and their actions and practices directed to the Class.

### *Philip Calderwood*

136.    On or about July 16, 2008, Mr. Calderwood wired the sum of $50,000 to an escrow account at Chittenden Trust Company to purchase a Limited Partnership unit in Phase II.

137.    On or about July 17, 2008, Mr. Calderwood wired $500,000 to an escrow account at Chittenden Trust Company.

138.    These sums constituted the purchase price and the administrative fee for his Limited Partnership unit in Phase II.

139.    In making this investment, Mr. Calderwood reviewed and relied on the offering materials for this investment.

140.    The business plan for Phase II stated that the investment made by Mr. Calderwood would be used to build particular facilities and amenities in connection with the Phase II project.

141.    The Limited Partnership Agreement for Phase II stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts "with such bank or banks whose deposits are insured by an agency of the federal government," in the name of the

Langrock
Sperry
& Wool, llp

36

Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

142.    Nowhere did the offering materials provided to Mr. Calderwood disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

143.    In or about April 2016, Mr. Calderwood learned for the first time of the SEC Action and that Phase II in which he had invested was a "Ponzi" scheme.

144.    Mr. Calderwood has been damaged in that all or a portion of the funds that he invested in Phase II were misused, commingled, and used as collateral for margin loans.

145.    There are no material differences between these Defendants' actions and practices directed to Mr. Calderwood and their actions and practices directed to the Class.

### *Jose Antonio Pietri*

146.    On or about June 19, 2013, Mr. Pietri made a refundable deposit of $10,000 to an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VII.

147.    On or about August 15, 2013, Mr. Pietri wired $550,000 to an escrow account at People's Bank, which was the purchase price and the administrative fee for one Limited Partnership unit in Phase VII.

148.    Thereafter, at his request, Mr. Pietri's initial deposit of $10,000 was returned to him.

149.    In making this investment, Mr. Pietri reviewed and relied on the offering materials for this investment.

Langrock
Sperry
& Wool, llp

37

150.   The business plan for Phase VII stated that the investment made by Mr. Pietri would be used to build a "world class" biomedical research facility with clean rooms in a sterile environment and high-tech equipment that scientists need for research efforts.

151.   The Limited Partnership Agreement for Phase VII stated that: (i) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (ii) the monies would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership, which accounts were to be controlled by the General Partner; (iii) the General Partner would not borrow from the funds of the Limited Partnership; and (iv) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

152.   Nowhere did the offering materials provided to Mr. Pietri disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

153.   On or about April 22, 2016, Mr. Pietri learned for the first time of the SEC Action and that Phase VII in which he had invested was a "Ponzi" scheme.

154.   Mr. Pietri has been damaged in that all or a portion of the funds that he invested in Phase VII were misused, commingled, and used as collateral for margin loans.

155.   There are no material differences between these Defendants' actions and practices directed to Mr. Pietri and their actions and practices directed to the Class.

### *Tongyi Wang*

156.   On or about December 4, 2015, Mr. Wang made a refundable deposit of $10,000 to an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VIII.

Langrock
Sperry
& Wool, LLP

38

157.    Soon thereafter, on December 9, 2015, Mr. Wang wired $515,000 to an escrow account at People's Bank, which was the balance of the purchase price and the administrative fee for his Limited Partnership unit.

158.    In making this investment, Mr. Wang reviewed and relied on the offering materials for this investment.

159.    The Limited Partnership Agreement for Phase VIII stated that: (a) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (b) investors' funds would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership, which would be controlled by the General Partner; (c) the General Partner would not borrow the funds of the Limited Partnership; and (d) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of another person.

160.    Nowhere did the offering materials provided to Mr. Wang disclose that his funds would be allocated for purposes not authorized by his Limited Partnership Agreement.

161.    On or about April 22, 2016, Mr. Wang learned for the first time of the SEC Action and that Phase VIII in which he had invested was a "Ponzi" scheme.

162.    Mr. Wang has been damaged in that all or a portion of the funds that he invested in Phase VIII were misused, commingled, and used as collateral for margin loans.

163.    There are no material differences between these Defendants' actions and practices directed to Mr. Wang and their actions and practices directed to the Class.

### *Jose Casseres-Pinto*

Langrock
Sperry
& Wool, ...

164.    On or about January 25, 2013, Dr. Casseres-Pinto made a refundable deposit of $10,000 to an escrow account at People's Bank to purchase a Limited Partnership unit in Phase VII.

165.    On or about February 11, 2013, Dr. Casseres-Pinto wired $550,000 to the "Jay Peak Biomedical Research Park" account at People's Bank, for the purchase of one Limited Partnership unit in Phase VII, of which $50,000 went toward an administrative fee.

166.    In making this investment, Mr. Casseres-Pinto reviewed and relied on the offering materials for this investment.

167.    The business plan for Phase VII stated that Dr. Casseres-Pinto's investment would be used to build a "world class" biomedical manufacturing and research facility with "clean room" spaces and sophisticated equipment for scientists' research efforts.

168.    The Limited Partnership Agreement for Phase VII stated that: (a) the business of the Limited Partnership would be conducted in accordance with federal law applicable to an EB-5 program; (b) investors' funds would be deposited into accounts with banks or financial institutions in the name of the Limited Partnership, which would be controlled by the General Partner; (c) the General Partner would not borrow from the funds of the Limited Partnership; and (d) the General Partner would not permit the monies contributed to the Limited Partnership to be commingled with the funds of any other person or entity.

169.    Nowhere did the offering materials provided to Dr. Casseres-Pinto disclose that his funds would be allocated for purposes not authorized by the Limited Partnership Agreement.

170.    In April 2016, Dr. Casseres-Pinto first learned of the SEC Action and that the Phase VII project in which he invested was part of a Ponzi scheme.

Langrock
Sperry
& Wool, ...

40

171.   Dr. Casseres-Pinto has been damaged in that all or a portion of the funds that he invested in Phase VII were misused, commingled, and used as collateral for margin loans.

172.   There are no material differences between these Defendants' actions and practices directed to Dr. Casseres-Pinto and their actions and practices directed to the Class.

## VI.   AGENCY, ALTER EGO, AND CO-CONSPIRATOR ALLEGATIONS

173.   At all relevant times, each Defendant and each Relevant Nonparty was a principal, agent, alter ego, joint venturer, partner, or affiliate of each Defendant and each of the other Relevant Nonparties, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. Each Defendant and each Relevant Nonparty had actual knowledge of the wrongful acts of each Defendant and each of the other Relevant Nonparties; ratified, approved, joined in, acquiesced, or authorized the wrongful acts of each Defendant and each of the other Relevant Nonparties; and retained the benefits of those wrongful acts.

174.   Each Defendant and each Relevant Nonparty aided and abetted, encouraged, and rendered substantial assistance to the other Defendants and Relevant Nonparties in perpetrating their fraudulent scheme on Plaintiffs and the class. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct set forth herein, each Defendant and each Relevant Nonparty acted with an awareness of its or his primary wrongdoing and realized that its or his conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

## VII.   TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

Langrock
Sperry
& Wool, LLP

41

175.    Plaintiffs and the class members did not and could not have discovered the facts constituting Defendants' violations until the SEC complaint was made available to the public on April 14, 2016.

176.    Defendants concealed Quiros's wrongdoing, and People's Bank's assistance therein, by carrying out the complex series of transactions through which Plaintiff's funds were misappropriated, commingled, and misused.

177.    Plaintiffs learned of the actions of Quiros, People's Bank, MSK, and Gordon—directly or indirectly—through the SEC and Vermont actions and media coverage about them. Plaintiffs then retained counsel.

178.    Because Plaintiffs and the Class could not have reasonably discovered the facts constituting Defendants' violations until April 14, 2016, their claims accrued on that date and all applicable statutes of limitation were tolled until that date.

### VIII.        CLASS ACTION ALLEGATIONS

179.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

180.    The Class is defined as:

> All persons who invested in the Limited Partnerships associated
> with the Jay Peak and Q Burke projects.

181.    Excluded from the Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

182.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

183.    The Class satisfies the requirements of Rules 23(a) and 23(b)(3).

Langrock
Sperry
& Wool,

184.   Numerosity. The Class consists of more than 800 geographically dispersed individuals. Joinder of the Class members is not practicable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

185.   Ascertainability. The individual Class members are presently ascertainable by reference to objective criteria. The names and addresses of all Class members can be identified in the business records maintained by the Jay Peak and Q Burke Projects. Notice of this action can readily be provided to all members of the proposed Class.

186.   Typicality. Plaintiffs were investors in the Jay Peak and Q Burke Projects at the time of the wrongdoing alleged herein. Plaintiffs' claims are typical of the claims of all Class members as all Class members have been similarly affected by Defendants' wrongful conduct alleged herein.

187.   Adequacy of Representation. Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation, including litigation relating to investment fraud. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

188.   Commonality and Predominance. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, but are not limited to:

a.   Whether Defendants knew of the Jay Peak and Q Burke General Partners' breaches of fiduciary duties to the investors in the Limited Partnerships;

Langrock
Sperry
& Wool, LLP

43

b.    Whether People's Bank substantially assisted the General Partners' wrongdoing;

c.    Whether People's Bank had knowledge that its conduct would assist the General Partners in breaching their fiduciary duties to the investors in the Limited Partnerships;

d.    Whether People's Bank owed a fiduciary duty to each investor in the Limited Partnerships, and breached that duty by facilitating transfers to and from the Raymond James accounts controlled by Quiros, causing damage to Plaintiffs and the Class;

e.    Whether People's Bank breached its escrow arrangements with Plaintiffs and Class members, causing them damage; and

f.    Whether Defendants conspired to advance the General Partners' breaches of fiduciary duty, and if so, whether each Defendant committed overt acts in furtherance of their conspiracy.

189.    Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment also will avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this litigation as a class action.

### COUNT I

### AIDING AND ABETTING FRAUD
#### (against People's Bank)

190.    Plaintiffs re-allege and incorporate paragraphs 1–178 as if fully set forth herein.

191.    People's Bank had actual knowledge of and substantially assisted Quiros's fraud. As an escrow agent, moreover, People's Bank owed Plaintiffs and Class members a fiduciary duty to disclose known fraud regardless of the terms of a particular escrow agreement.

Langrock
Sperry
& Wool,

192.    From the outset of Quiros's involvement with Jay Peak, Quiros and Stenger directed People's Bank to ignore its fiduciary obligations and violate the terms of its escrow agreements with investors, as well as the Limited Partnership Agreements at the heart of the fraud, and People's Bank complied. For example:

a.    Through Stenger, Quiros routinely instructed People's Bank to transfer funds from designated Limited Partnership escrow accounts at People's Bank to brokerage accounts at Raymond James. With respect to Phases I–III, People's Bank knew that investor funds were required to be held in a bank, not a brokerage account. With respect to Phases I and II, People's Bank knew that the bank account in which investors' funds were deposited was to be federally insured. Despite this knowledge, People's Bank executed the transfers to a brokerage account as instructed by Quiros.

b.    Quiros and Stenger directed some transfers from a designated escrow account for one limited partnership at People's Bank to a brokerage account designated for a different limited partnership at Raymond James (e.g., the transfer of funds from People's Bank Phase II to Raymond James Phase III). Stenger first requested such a transfer as early as July 2008, when he instructed People's Bank to transfer $600,000 in Phase II investor funds to a Q Resorts Raymond James account. People's Bank's escrow agreements with investors made clear that People's Bank was only to release investor funds to the particular limited partnership in which the investor had purchased shares. Thus, People's Bank knew that Quiros and Stenger were misdirecting investor funds to unauthorized accounts, and effected the misdirection of these funds despite this knowledge.

c.    Quiros and Stenger also instructed People's Bank to transfer and commingle investor funds among Limited Partnership escrow accounts. *See, e.g.,* ¶¶ 67, 79, *supra*. As explained above, People's Bank knew that investor funds were to be held in designated escrow accounts and transferred only to a designated account in the name of the same limited partnership. For Phases I–III, People's Bank also knew that investor funds were to be deposited in bank accounts, not brokerage accounts. As a result, People's Bank knew from the beginning that Quiros and Stenger were violating the Limited Partnership Agreements with investors, asking People's Bank to violate their escrow accounts and fiduciary duties to investors, and commingling investor funds among People's Bank's escrow accounts. Nevertheless, People's Bank executed these transfers as requested by Quiros and Stenger.

Langrock
Sperry
& Wool, LLP

45

d.     Throughout the ten-year business relationship between Jay Peak and People's Bank, People's Bank knew that each of the Limited Partnerships was participating in the EB-5 Program, and, therefore, at all times People's Bank also knew that the investors expected their capital contributions to be dedicated to the account corresponding to their EB-5 Project. People's Bank received and was familiar with the Limited Partnership Agreement and escrow agreement for each phase. People's Bank consequently knew that investors had agreed to have their funds invested only with the Limited Partnership in which they had purchased shares.

e.     After February 2012, People's Bank knew that Rapid Visa had terminated its relationship with Jay Peak because Rapid Visa no longer had confidence in the accuracy of Jay Peak's financial representations, financial status, or disclosures. Rapid Visa informed People's Bank that it should not use or rely upon any documents that it received from Rapid Visa regarding Jay Peak. By this time, People's Bank also knew that investors had complained about misrepresentations by Jay Peak, and that Jay Peak was causing funds to be released from People's Bank's escrow accounts *before* investors' EB-5 applications had been approved. Still, People's Bank assured investors that the accounts were secure and continued to process transactions for Jay Peak without conducting an investigation or suspending the accounts in question.

f.     Despite the knowledge it had acquired as a result of the impermissible transfers Stenger directed with regard to Phases I through III, as well as the investor complaints and the information it had received from Rapid Visa, People's Bank continued to transfer investor funds to Raymond James accounts, which Quiros then used to advance his fraudulent scheme.    For example, in February 24, 2012, Quiros used approximately $5.8 million from Phase VI and approximately $16.6 million from Phase V to make payments on a margin loan related to Phases I and II.  Had People's Bank met its fiduciary duties to Phase V and VI investors, and declined to assist Quiros by transferring the funds to Raymond James, Quiros would not have been able to misdirect the Phase V and VI investor funds.  Similarly, between October 2013 and June 2015, Quiros used approximately $4.6 million in Phase VIII investor funds to cover expenses unrelated to Phase VIII.  Had People's Bank not transferred Phase VIII investor funds to accounts under Quiros's control—despite the knowledge it had acquired by October 2013, and in violation of its fiduciary duties—Quiros would not have been able to misdirect Phase VIII investors' funds.

g.     People's Bank knew that Jay Peak was receiving and transmitting millions of dollars of wires in circular transfers that had no apparent legitimate purpose. For example, on March 4, 2014, over $18 million went from the Phase VII account at Raymond James to the Phase VII

Langrock
Sperry
& Wool

operating account at People's Bank. That same day, $18 million went from the Phase VII account at People's Bank to Raymond James. Thus, within a 24-hour span, $18 million flowed into People's Bank from Raymond James and then flowed back to Raymond James—a red flag for money laundering.

193.    The specific misconduct that gives rise to this claim for aiding and abetting common law fraud was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

194.    Plaintiffs and the Class suffered injuries, in the form of investment losses, which were actually caused by People's Bank's aiding and abetting of fraud.

195.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment against People's Bank for compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT II

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against People's Bank)

196.    Plaintiffs re-allege and incorporate paragraphs 1–178 as if fully set forth herein.

197.    Each of the General Partners owed fiduciary duties to the investors in the respective Limited Partnerships. The fiduciary duties arose by operation of law and under the terms of the Limited Partnership Agreements for each of the Limited Partnerships. Under each Limited Partnership Agreement, the General Partner promised the investors of that Limited Partnership that it would not borrow from the Partnership or commingle Partnership funds with the funds of any Person.

Langrock
Sperry
& Wool,

47

198.    Each of the General Partners breached the fiduciary duties directly owed to the Limited Partners by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

199.    People's Bank substantially assisted in the General Partners' breaches of fiduciary duty with knowledge that the General Partners were breaching fiduciary duties owed to Plaintiffs and the Class.

200.    As a result of the breaches of fiduciary duties directly owed to the investors, Plaintiffs and the Class suffered damages.

201.    The specific misconduct that gives rise to this claim for aiding and abetting fiduciary breach was intentional, malicious, deliberate, outrageous, reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate. In addition, senior management of People's Bank engaged in such conduct, or knowingly condoned, ratified or consented to such conduct.

202.    Plaintiffs and the Class suffered injuries, in the form of investment losses, which were actually caused by People's Bank's aiding and abetting of breach of fiduciary duty.

203.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT III

### BREACH OF FIDUCIARY DUTY
### (against People's Bank)

Langrock
Sperry
& Wool, LLP

48

204. Plaintiffs re-allege and incorporate paragraphs 1–178 as if fully set forth herein.

205. As part of investing in the Limited Partnerships, each investor sent his or her funds into an escrow account at People's Bank that was named for the Limited Partnership in which he or she had invested. People's Bank thus owed escrow obligations to Plaintiffs and each member of the Class.

206. Due to the escrow relationship between Plaintiffs and members of the Class, on one hand, and People's Bank, on the other, People's Bank owed a fiduciary duty to Plaintiffs and the Class. This fiduciary duty included, at a minimum, an obligation to exercise reasonable skill and ordinary diligence in following the escrow instructions, disbursing the investor funds entrusted to it, and responding appropriately to suspicious activity occurring in connection with the escrowed funds. Moreover, regardless of the express terms of the escrow agreement, People's Bank owed Plaintiffs and Class members a duty to disclose known fraud being committed on them because it was acting as an escrow agent.

207. By releasing escrowed funds to unauthorized accounts and non-bank financial institutions and into accounts uncontrolled by the General Partners of the specific EB-5 Project at issue, and by failing to notify Plaintiffs and the Class of suspicious activity occurring in connection with the escrowed funds, People's Bank breached its fiduciary duties to Plaintiffs and the Class.

208. The specific misconduct that gives rise to this claim for fiduciary breach was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate. In addition, senior management

Langrock
Sperry
& Wool...

49

of People's Bank engaged in such conduct, or knowingly condoned, ratified or consented to such conduct.

209.    Plaintiffs and the Class suffered injuries, in the form of investment losses, that were actually caused by People's Bank's breaches of fiduciary duty.

210.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

**COUNT IV**

**BREACH OF CONTRACT**
**(against People's Bank)**

211.    Plaintiffs re-allege and incorporate paragraphs 1–178 as if fully set forth herein.

212.    In connection with their investments in the Limited Partnerships, each Plaintiff and each member of the Class entered into an escrow agreement with People's Bank.

213.    Pursuant to these escrow agreements, each investor in a Limited Partnership wired or sent his or her funds for deposit in an escrow account held at People's Bank in the name of the Limited Partnership.

214.    The Escrow Agreements provided that upon release of the escrowed funds, the funds would be committed to the specific Limited Partnership project for which the funds had been placed in escrow.

215.    People's Bank breached its escrow obligations by releasing the escrowed funds for improper use to accounts not controlled by the Limited Partnership for which the funds had been placed in escrow.

Langrock
Sperry
& Wool,

216.   People's Bank's improper transfers of escrowed funds frustrated Plaintiffs' and Class members' reasonable expectations under the escrow agreements that the funds would be applied by a neutral escrow agent for the designated investment purpose only.

217.   As a direct and proximate result of People's Bank's breaches of the escrow agreements, Plaintiffs and the Class have suffered damages.

218.   By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### COUNT V

### AIDING AND ABETTING COMMON LAW FRAUD
### (against Gordon and MSK)

Plaintiffs re-allege and incorporate paragraphs 1-178 as if fully set forth herein.

219.   Gordon and MSK had actual knowledge of the fraud that was being committed by Quiros.   The facts that indicate the actual knowledge of the fraud include, without limitation, the following:

a.   On May 22, 2014, Gordon, a partner with MSK, was present during a deposition of Quiros conducted by the SEC.

b.   During the course of that deposition, Quiros admitted to commingling investor funds, describing Phases I-VI as *"one phase,"* one pool of money. *See* May 22, 2014 SEC Depo. Tr. at 94:2-4.  From the single pool of money, Quiros claimed he was building "one program within one resort." *Id.* at 95:1-2.

c.   Quiros testified that "once [an individual] invests, it is now my money. It is totally my money..." *Id.* at 90:3-4. Quiros further testified that once investor funds were transferred to a Quiros-controlled account, he could "do whatever I want" with them. *Id.* at 128:22–23.

d.   As a specific example of commingling among phases, Quiros admitted in Gordon's presence to applying $18.2 million of investor funds derived from a Phase VII account at People's Bank toward paying off a margin loan related to Phases V and VI.

Langrock
Sperry
& Wood, LLP

220.    Gordon and MSK rendered substantial assistance to Quiros in his commission of a fraud against the investors by, among other things, the following specific acts:

a.    Despite actual knowledge that Quiros admitted to: (1) commingling funds between each phase; (2) believing that all investor funds to belong to him, personally; and (3) planning to do whatever he wanted with investor funds, Gordon and MSK concealed those admissions during an investigation by the Vermont DFR.

b.    Gordon met with the Vermont DFR on December 19, 2014 to discuss: (1) Quiros's banking irregularities, and (2) Quiros's future ability to raise EB-5 capital.  Gordon memorialized the meeting in a letter to the Vermont DFR dated February 27, 2015.

c.    Gordon's letter obstructed the Vermont DFR's investigation by describing Quiros's banking transactions as providing "investors the absolute maximum amount of safety they could have received.  The only way in which investors could have suffered any loss would have been if the U.S. government defaulted on its debt." However, Gordon knew that investors' funds were never safe—Quiros had admitted under oath in Gordon's presence that he took investor funds for his own use and intended to do whatever he wanted with them.

d.    Gordon's meeting and letter substantially assisted conceal Quiros's fraudulent scheme from the Vermont DFR.

e.    Relying on Gordon's misrepresentations, the Vermont DFR approved Quiros's offering materials to raise millions of dollars in EB-5 funds for Phases VII and VIII.

f.    Phase VII and VIII investors relied on the misleading offering materials prior to investing in Jay Peak and Q Burke.

g.    Because Gordon and MSK concealed Quiros's fraudulent admissions from the Vermont DFR, Quiros was able to misappropriate millions of dollars invested in Phases VII and VIII.

221.    The specific misconduct that gives rise to this claim for aiding and abetting common law fraud was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

Langrock
Sperry
& Wool, LLP

52

222.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment against Gordon and MSK for compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT VI

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against Gordon and MSK)

Plaintiffs re-allege and incorporate paragraphs 1-178 above as if fully set forth herein.

223.    Each of the General Partners owed fiduciary duties to the investors in the respective Limited Partnerships. The fiduciary duties apply by operation of law and the terms of the Limited Partnership Agreements for each of the Limited Partnerships. In each Limited Partnership Agreement, the General Partner promised the investors of that Limited Partnership that it would not borrow from the Partnership or commingle Partnership funds with the funds of any Person.

224.    Each of the General Partners breached the fiduciary duties directly owed to the Limited Partners by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class. The facts that indicate MSK's and Gordon's actual knowledge of the fraud include, without limitation, the following:

a.  On May 22, 2014, Gordon, a partner with MSK, was present during a deposition of Quiros conducted by the SEC.

b.  During the course of that deposition, Quiros admitted to commingling investor funds, describing Phases I-VI as "one phase," one pool of money. *See* May 22, 2014 SEC Depo. Tr. at p. 94:2-4. From the single pool of money, Quiros claimed he was building "one program within one resort." *Id.* at p. 95:1-2.

c.  Quiros testified that "once [an individual] invests, it is now my money. It is totally my money..." *Id.* at 90:3-4. Quiros further testified that once investor funds were transferred to a Quiros-controlled account, he could "do whatever I want" with them. *Id.* at 128:22–23.

Langrock
Sperry
& Wool

    d. As a specific example of commingling among phases, Quiros admitted in Gordon's presence to applying $18.2 million of investor funds derived from a Phase VII account at People's Bank toward paying off a margin loan related to Phases V and VI.

225.    Gordon and MSK substantially assisted in the General Partners' breaches of fiduciary duty by, among other things, the following specific acts:

    a. Despite actual knowledge that Quiros admitted to: (1) commingling funds between each phase; (2) believing that all investor funds to belong to him, personally; and (3) planning to do whatever he wanted with investor funds, Gordon and MSK concealed those admissions during an investigation by the Vermont DFR.

    b. Gordon met with the Vermont DFR on December 19, 2014 to discuss: (1) Quiros's banking irregularities, and (2) Quiros's future ability to raise EB-5 capital. Gordon memorialized the meeting in a letter to the Vermont DFR dated February 27, 2015.

    c. Gordon's letter obstructed the Vermont DFR's investigation by describing Quiros's banking transactions as providing "investors the absolute maximum amount of safety they could have received. The only way in which investors could have suffered any loss would have been if the U.S. government defaulted on its debt." However, Gordon knew that investors' funds were never safe—Quiros had admitted under oath in Gordon's presence that he took investor funds for his own use and intended to do whatever he wanted with them.

    d. Gordon's meeting and letter substantially assisted conceal Quiros's fraudulent scheme from the Vermont DFR.

    e. Relying on Gordon's misrepresentations, the Vermont DFR approved Quiros's offering materials to raise millions of dollars in EB-5 funds for Phases VII and VIII.

    f. Phase VII and VIII investors relied on the misleading offering materials prior to investing in Jay Peak and Q Burke.

    g. Because Gordon and MSK concealed Quiros's fraudulent admissions from the Vermont DFR, Quiros was able to misappropriate millions of dollars invested in Phases VII and VIII.

226.    As a result of the breaches of fiduciary duties directly owed to the investors, Plaintiffs and the Class suffered damages.

227.    The specific misconduct that gives rise to this claim for aiding and abetting common law fraud was intentional, malicious, deliberate, outrageous and reprehensible,

Langrock
Sperry
& Wool, LLP

54

and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

228.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT VII

### CIVIL CONSPIRACY
### (against Gordon, MSK, and People's Bank)

229.    Plaintiffs re-allege and incorporate paragraphs 1–178 above as if fully set forth herein.

230.    Gordon, MSK, People's Bank, Quiros, and Stenger entered into a combination and common design to effect the illegal objective of defrauding investors by illegal means.

231.    At all relevant times, each of Gordon, MSK, and People's Bank was a principal, agent, alter ego, joint venturer, partner, or affiliate of Quiros and Stenger, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. Each of Gordon, MSK, and People's Bank had actual or constructive knowledge of the acts of each of the others, and ratified, approved, joined in, acquiesced, or authorized the wrongful acts of each of the others and/or retained the benefits of those wrongful acts.

232.    Gordon, MSK, and People's Bank, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other, as well as to Relevant Nonparties, in perpetrating their unlawful, unfair or fraudulent scheme on Plaintiffs and the

Langrock
Sperry
& Wool

Class. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct complained of, each of Gordon, MSK, and People's Bank acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing herein alleged.

233. Gordon and MSK had actual knowledge of the fraud that was being committed by Quiros and agreed to act in furtherance of it. The testimony that put Gordon on notice of the fraud at Jay Peak includes, without limitation, the following:

a. On May 22, 2014, Gordon, a litigation partner at MSK, was present during a deposition of Quiros conducted by the SEC.

b. During the course of that deposition, Quiros admitted to commingling investor funds, describing Phases I-VI as "one phase," one pool of money. May 22, 2014 SEC Dep. at p. 94:2–4. From the single pool of money, Quiros claimed he was building "one program within one resort." *Id.* at 95:1–2.

c. In one instance, Quiros admitted to using $18.2 million from Phase VII toward paying off a margin loan related to Phases V and VI, intentionally commingling the funds between those two distinct Phases. *See id.* at 228–34.

d. Quiros also admitted using investor funds for his personal expenses. Once an investor placed their money into a Quiros controlled account, Quiros acted as if the funds were "now in the new owner's hand, which is Ariel Quiros . . . now I can do whatever I want." *Id.* at p. 128:20–23. Pursuant to Quiros's testimony, once an investor "invests, it is now my money. It is totally my money." *Id.* at 90:3–4.

234. Gordon is an attorney experienced in securities litigation. Quiros's statements expressing the belief that money raised for separate partnerships formed to build distinct EB-5 projects could be applied at Quiros's sole discretion, as if it were his property, placed Gordon on actual notice that the offering materials for the Jay Peak projects were false and misleading and that investors were being misled about the use of their funds.

Langrock
Sperry
& Wool LLP

235.    Gordon and MSK rendered substantial assistance to Quiros in defrauding investors by, among other things, committing the following overt acts and material omissions:

a.    During an investigation by the Vermont DFR, Gordon and MSK concealed Quiros's admissions that he: (1) commingled funds between each phase; (2) believed all investor funds to belong to him, personally; and (3) intended to do whatever he wanted with investor funds.

b.    Gordon met with Vermont DFR officials on December 19, 2014 to discuss: (1) Quiros's banking irregularities, and (2) Quiros's future ability to raise EB-5 capital. Gordon memorialized the meeting in a letter to the Vermont DFR dated February 27, 2015.

c.    Gordon's letter obstructed the Vermont DFR's investigation by describing Quiros's banking transactions as providing "investors the absolute maximum amount of safety they could have received. The only way in which investors could have suffered any loss would have been if the U.S. government defaulted on its debt." In fact, Gordon knew that investors' funds were never safe—Quiros had admitted under oath in Gordon's presence that he took investor funds for his own use and intended to do whatever he wanted with them.

d.    Gordon's meeting and letter substantially aided in the fraudulent solicitation of funds from Jay Peak investors by concealing the scheme from the Vermont DFR.

e.    Relying on Gordon's misrepresentations, the Vermont DFR approved Quiros's offering materials to raise tens of millions of dollars in additional EB-5 funds for Phases VII and VIII.

f.    Because Gordon and MSK concealed Quiros's fraudulent admissions from the Vermont DFR, Quiros was able to misappropriate funds invested in Phases VII and VIII.

g.    Gordon's and MSK's concealment of Quiros's fraudulent admissions from the Vermont DFR served to perpetuate Quiros's scheme for several more years, leading to millions in additional investments in Phases VII and VIII.

236.    Gordon's and MSK's acts and omissions in furtherance of the conspiracy were independently unlawful. They impeded and subverted the investigation of a regulatory agency.

Langrock
Sperry
& Wood, LLP

237.    In the first half of 2008, People's Bank and Quiros reached an agreement to induce Plaintiffs and the Class into investing millions of dollars into the Limited Partnerships and to commit the fraud and fiduciary breaches detailed above.

238.    People's Bank committed overt acts in furtherance of the conspiracy, including by releasing investors' funds despite knowing that those transfers violated investors' subscription agreements and escrow obligations owed by People's Bank to the investors, and by concealing known fraud from investors for its own benefit and for the benefit of Quiros and the other perpetrators of the Jay Peak fraud.

239.    As a direct and proximate consequence of Defendants' conspiracy and overt acts in furtherance thereof, Plaintiffs and the Class have lost money that they invested in the Limited Partnerships, have been denied the use of their money, and have been damaged thereby in an amount to be determined at trial. Defendants' conspiracy, and their overt acts in furtherance thereof, served both to attract new victims to the Jay Peak fraud and to exacerbate the losses of existing investors.

240.    The specific misconduct that gives rise to this claim for civil conspiracy was intentional, malicious, deliberate, outrageous, and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate. In addition, in the case of the entity Defendants, senior management of the entities engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

241.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, respectfully request that the Court enter judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel to serve as representatives of the Class;

(2)     Awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(3)     Awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(5)     Awarding such other and further relief the Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

DATED at Burlington, Vermont this 5ᵗʰ day of October, 2018.

Langrock
Sperry
& Wool, llp

LANGROCK SPERRY & WOOL, LLP

Lisa B. Shelkrot
PO Box 721, 210 College Street
Burlington, VT 05402
lshelkrot@langrock.com
Phone: (802) 864-0217

Attorneys for Plaintiffs

Harley S. Tropin, Esq.
hst@kttlaw.com
Dyanne E. Feinberg
def@kttlaw.com
Rachel Sullivan, Esq.
rs@kttlaw.com
Maia Aron, Esq.
ma@kttlaw.com
Tal J. Lifshitz, Esq.
tjl@kttlaw.com
**KOZYAK TROPIN &
THROCKMORTON LLP**
*Pro Hac Vice Pending*
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone: (305) 372-1800
Facsimile: (305) 372-3508

*Counsel for Plaintiffs*

Daniel C. Girard
dgirard@girardsharp.com
Angelica M. Ornelas
aornelas@girardsharp.com
**GIRARD SHARP LLP**
*Pro Hac Vice Pending*
601 California Street, Suite 1400
San Francisco, California 94108
Phone: (415) 981-4800
Fax: (415) 981-4846

*Counsel for Plaintiffs*

Paul Aiello
paiello@bennettaiello.com
Michael P. Bennett
mbennett@bennettaiello.com
**BENNETT AIELLO**
*Pro Hac Vice Pending*
The Ingraham Building, Eighth Floor
25 Southeast Second Avenue
Miami, Florida 33131
Telephone:     (305) 358-9011
Facsimile:      (305) 358-9012

*Counsel for Plaintiffs*

Langrock
Sperry
& Wool,

806558.1