UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 APR 30  PM 4: 57

CLERK

BY _____
DEPUTY CLERK

ALMASOOD QURESHI, CARLOS ENRIQUE     )
HILLER SANCHEZ, PHILLIP CALDERWOOD,  )
JOSE ANTONIO PIETRI, JOSE R. CASSERES-)
PINTO, TONGYI WANG, and ALEXANDRE    )
DACCACHE, on behalf of themselves and all )
others similarly situated,           )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )     Case No. 2:18-cv-00163
                                     )
PEOPLE'S UNITED BANK, MITCHELL       )
SILBERBERG & KNUPP, LLP, individually )
and as successor-in-interest to RICHARDSON )
& PATEL, LLP, DAVID B. GORDON, and   )
DAVID B. GORDON, A PROFESSIONAL      )
CORPORATION,                         )
                                     )
        Defendants.                  )

**OPINION AND ORDER**
**DENYING MOTION FOR SANCTIONS OF PEOPLE'S UNITED BANK,**
**GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS OF**
**PEOPLE'S UNITED BANK, GRANTING MOTION TO DISMISS OF**
**MITCHELL SILBERBERG & KNUPP, LLP, DAVID B. GORDON, AND DAVID**
**B. GORDON, A PROFESSIONAL CORPORATION,**
**AND GRANTING LEAVE TO AMEND**
(Docs. 85, 86, & 90)

Plaintiffs Almasood Qureshi, Carlos Enrique Hiller Sanchez, Phillip Calderwood,

Jose Antonio Pietri, Jose R. Casseres-Pinto, Tongyi Wang, and Alexandre Daccache

(collectively, "Plaintiffs") bring this suit against Defendants People's United Bank

("PUB") as well as against the law firm of Mitchell Silberberg & Knupp, LLP,

individually and as successor-in-interest to Richardson & Patel, LLP, David B. Gordon,

and David B. Gordon, a professional corporation (together, the "Law Firm Defendants")

(collectively with PUB, "Defendants"), asserting individual and class action claims

arising out of alleged misconduct in connection with development projects through the federal EB-5 Immigrant Investor Program. Pending before the court are PUB's motion for sanctions against Plaintiffs pursuant to Federal Rule of Civil Procedure 11 as well as two motions to dismiss filed by PUB and the Law Firm Defendants, respectively.

Plaintiffs are represented by Angelica M. Ornelas, Esq., Daniel C. Girard, Esq., Harley Tropin, Esq., Lisa B. Shelkrot, Esq., Maia Aron, Esq., Michael P. Bennett, Esq., Paul Aiello, Esq., Rachel Sullivan, Esq., and Tal J. Lifshitz, Esq. PUB is represented by James J. Stricker, Esq., and John J. Kennelly, Esq. The Law Firm Defendants are represented by Bridget C. Asay, Esq., John Durrant, Esq., and Michael N. Donofrio, Esq.

## I.    Procedural Background.

Plaintiffs filed their original Complaint on October 5, 2018. On December 21, 2018, PUB and the Law Firm Defendants moved to dismiss the Complaint. With the court's permission, Plaintiffs filed a consolidated response opposing both motions to dismiss on February 5, 2019, and PUB and the Law Firm Defendants both replied on February 26, 2019. The court held a hearing on the motions to dismiss on March 29, 2019, after which it granted the motions to dismiss and granted Plaintiffs leave to amend their Complaint.

Plaintiffs filed their Amended Class Action Complaint on May 9, 2019 (the "AC"), and PUB and the Law Firm Defendants filed separate motions to dismiss the AC on June 28, 2019. (Docs. 85 and 86.) Following the filing of the motions to dismiss, on July 11, 2019, Plaintiffs filed a Notice of Errata (the "Errata") to correct errors in five paragraphs of their eighty-page, 330-paragraph AC. The Errata states in relevant part:

Paragraph 63: [PUB] was initially restricted, based on the terms of the Limited Partnership Agreements and offering documents incorporated into the Investor Escrow Agreements, to transferring escrowed investor funds from the Limited Partnership escrow account to another bank account held in the name of that Limited Partnership.

Paragraph 87: Again, [PUB] neither sought nor received a credible explanation for these transfers, despite the fact that Quiros had not yet purchased the resort, and that the transfer of the $11 million to Raymond James (a non-bank institution) violated the requirement in Section 13.01 of

2

the original Phase I Limited Partnership Agreement that investor funds be deposited in "a bank or banks whose deposits are insured by an agency of the federal government."

Paragraph 91: On July 1, 2008, [PUB] released $1 million ~~directly~~ from the Phase I ~~escrow~~ operating account at [PUB] to Quiros's Q Resorts account at Raymond James.

Paragraph 93: [PUB] knew that each of its transfers to Raymond James in connection with Quiros's purchase of the resort violated the express prohibition of the ~~applicable~~ Phase II Limited Partnership Agreements on transferring investor funds to a non-bank entity such as Raymond James, and the requirement that any particular investor's funds be used only for the activities of the specific Limited Partnership in which he had invested.

Paragraph 216: Mr. Daccache learned the same in ~~November~~ September 2015, Dr. Casseres-Pinto in April 2016, Mr. Qureshi in April 2016, Mr. Pietri in ~~April 2016~~ March 2014, and Mr. Wang in April 2016.

(Doc. 88 at 1-2.)

On July 12, 2019, PUB filed a motion seeking sanctions against Plaintiffs. (Doc. 90.) On August 20, 2019, Plaintiffs opposed Defendants' motions to dismiss in a consolidated response. On that same date, they opposed the motion for sanctions on August 6, 2019. PUB filed a reply in support of its motion for sanctions. On September 6, 2019, PUB and the Law Firm Defendants filed replies in support of their respective motions to dismiss. The court heard oral argument on October 29, 2019, at which time it took the pending motions under advisement.

## II.     The AC's Allegations.

In the AC, Plaintiffs amend their factual allegations and revise their legal claims to address concerns raised by Defendants in their prior motions to dismiss and previously addressed by the court regarding standing, failure to state a claim, causation, and the statute of limitations.

Plaintiffs are seven individuals, all but one of whom presently live in the United States, who invested in various phases of the Jay Peak projects. No plaintiff alleges that he invested in the Phase I or Phases IV-VI Limited Partnerships.

Plaintiff Phillip Calderwood is a United States citizen (formerly a citizen of the United Kingdom) who lives in Florida and is the sole plaintiff who entered into a

3

subscription agreement for the purchase of a Limited Partnership interest in Jay Peak
Hotel Suites Phase II LLP on or about July 17, 2008 (the "Phase II Plaintiff"). He admits
that he did not execute a written escrow agreement. Plaintiffs allege that Phase II raised
$75 million from 150 investors through an EB-5 offering that proposed to build a hotel,
an indoor water park, an ice rink, and a golf clubhouse.

Plaintiff Alexandre Daccache is a United States citizen (formerly a citizen of
Brazil) who lives in Florida and is the sole plaintiff who entered into a subscription
agreement for the purchase of a Limited Partnership interest in Jay Peak Penthouse L.P.
(Phase III) on or about August 13, 2010 (the "Phase III Plaintiff"). Plaintiffs allege that
Phase III raised $32.5 million from sixty-five investors to build a fifty-five-unit
penthouse suites hotel and an activities center.

Plaintiff Jose R. Casseres-Pinto is a citizen of Venezuela who resides in the State
of Georgia and who entered into a subscription agreement for the purchase of a Limited
Partnership interest in Jay Peak Biomedical Research Park L.P. (Phase VII) on or about
February 11, 2013. Plaintiff Almasood Qureshi, a citizen of the Republic of India and a
permanent resident of the State of Georgia, entered into a subscription agreement for
Phase VII on or about March 1, 2013. Plaintiff Carlos Enrique Hiller Sanchez is a citizen
of Venezuela who currently resides in Florida and who entered into a subscription
agreement for Phase VII on or about April 17, 2013. Plaintiff Jose Antonio Pietri is a
citizen of Venezuela who resides in Florida and who entered into a subscription
agreement for Phase VII on August 20, 2013 (collectively, "the Phase VII Plaintiffs").
Plaintiffs allege that Phase VII raised approximately $83 million from 166 investors
through an EB-5 offering that purported to fund a biomedical research facility for which
AnC Bio Vermont GP Services, LLC ("AnC Bio") was the general partner.

Plaintiff Tongyi Wang is a citizen of Canada who lives in Canada and is the sole
plaintiff who entered into a subscription agreement for the purchase of a Limited
Partnership in Q Mountain Resort, Hotel, and Conference Center L.P. for Phase VIII on
or about December 4, 2015 (the "Phase VIII Plaintiff"). Plaintiffs allege that Phase VIII
raised approximately $53 million from 106 investors through an EB-5 offering to build a

4

hotel with 112 rooms, a conference center, and an outdoor pool, and that each investor in Phase VIII became a Limited Partner in the Q Burke Limited Partnership.

In their AC, Plaintiffs seek to bring claims on their own behalf as well as on behalf of a proposed class (the "Jay Peak Class") and a proposed subclass (the "MSK/Gordon Subclass"). They define the Jay Peak Class as "[a]ll persons who invested in Phases II through VIII of the Jay Peak Limited Partnerships after June 23, 2008[,]" (Doc. 78-1 at 63, ¶ 239) which is the date Ariel Quiros purchased the Jay Peak resort. Plaintiffs allege the Jay Peak Class consists of more than 800 individuals.

With regard to the proposed MSK/Gordon Subclass, Plaintiffs assert that it will be comprised of more than forty individuals, and define it to include "[a]ll persons who invested in Phases VII and VIII of the Jay Peak Limited Partnerships after February 27, 2015[,]" id. at 64, ¶ 239, which is the earliest date on which the Law Firm Defendants allegedly joined Mr. Quiros's fraudulent scheme "by lying to the Vermont [Department of Financial Regulation (the "Vermont DFR")] on Quiros's behalf to forestall enforcement action that would have prevented further harm to investors." Id. at 11, ¶ 11.

In April of 2016, the United States Securities and Exchange Commission (the "SEC") filed a civil enforcement action against Mr. Quiros, Jay Peak executive William Stenger, and the Limited Partnerships (the "SEC action"). The court in the SEC action appointed a Receiver to manage the Limited Partnerships and institute actions on their behalf. The Receiver has settled the SEC action for approximately $250 million and is attempting to sell the Jay Peak resort. The Receiver has brought claims on behalf of certain Limited Partnerships in this court in an action styled *Goldberg v. Saint-Sauveur Valley Resorts, Inc.*, Case No. 2:17-cv-00061 (the "*Goldberg* action").

In their AC, Plaintiffs assert claims against PUB in its alleged role "as escrow agent for each of the Jay Peak investors[,]" (Doc. 78-1 at 10, ¶ 9) and they assert that in the face of "compelling evidence of fraud by Jay Peak's principals[,]" PUB executed various financial transactions, falsely reassured investors, and concealed evidence of wrongdoing. *Id.* at 10, ¶ 10. They contend that PUB's alleged "fiduciary duty to Plaintiffs extended beyond the release of their funds regardless of the express terms of

[the] escrow agreement[s]." *Id.* at 59, ¶ 218. The Phase II Plaintiff, the Phase III Plaintiff, and the Phase VII Plaintiffs all claim their damages are traceable to and caused by PUB because, although they acknowledge that other persons and entities made fraudulent misrepresentations to them, PUB allegedly had actual knowledge of the Jay Peak Ponzi scheme and nonetheless facilitated it and failed to disclose it.

Plaintiffs claim the Law Firm Defendants served as Mr. Quiros's and Jay Peak's attorneys and allegedly knew that Mr. Quiros "had been commingling and misappropriating investor funds, but nevertheless represented to the Vermont regulators that the Jay Peak Limited Partnerships were safe investments[]" and had they "disclosed what [the Law Firm Defendants] knew, the Vermont regulators would have disallowed further investment in the scheme." *Id.* at 11, ¶ 11. The Phase VIII Plaintiff claims his damages are traceable to and caused by the Law Firm Defendants because they should have prevented the Phase VIII offering and should have disclosed their clients' alleged wrongdoing to the Vermont DFR which would have purportedly prompted the Vermont DFR to disallow further EB-5 Jay Peak projects.

Although Plaintiffs acknowledge that some of the investors have recovered some of their investment, four of the Plaintiffs have redeployed their investment to other EB-5 projects, and some of the investors including all but one Plaintiff are now United States citizens, they allege that neither they nor any other investor has been made whole. Plaintiffs seek to measure each investor's damages at the time of his or her investment, regardless of the amount of their recovery to date, although they offer a method for calculating "net loss" that reflects the "partial payments that investors have received since the scheme was discovered." *Id.* at 11, ¶¶ 12-13.

Plaintiffs allege that they are entitled to tolling or non-accrual of the statute of limitations because they did not and could not have discovered the facts which they allege give rise to PUB's and the Law Firm Defendants' liability until the complaint in the SEC action (the "SEC Complaint") was made available to the public on April 14, 2016. They rely on the SEC court's alleged finding that the scheme to defraud began with Mr. Quiros's purchase of Jay Peak and continued through Phase VII and that "there

6

is sufficient evidence to suggest that the Defendants [in the SEC action] actively concealed the fraud."  (Doc. 78-1 at 63, ¶ 238.)

The AC alleges the following causes of action: breach of fiduciary duty on behalf of the Jay Peak Class against PUB (Count I); aiding and abetting fraud on behalf of the Jay Peak Class against PUB (Count II); aiding and abetting a breach of fiduciary duty on behalf of the Jay Peak Class against PUB (Count III); aiding and abetting fraud on behalf of the MSK/Gordon Subclass against the Law Firm Defendants (Count IV); aiding and abetting a breach of fiduciary duty on behalf of the MSK/Gordon Subclass against the Law Firm Defendants (Count V); civil conspiracy against all Defendants on behalf of the Jay Peak Class (Count VI); and aiding and abetting a violation of the Vermont Consumer Protection Act, 9 V.S.A. ch. 63, on behalf of the Jay Peak Class against all Defendants (Count VII).

Plaintiffs seek compensatory and punitive damages, as well as the "consideration or the value of the consideration paid by the Plaintiffs and the Class, exemplary damages up to three times the value of the consideration paid by the Plaintiffs and the Class," and attorney's fees and expenses.  (Doc. 78-1 at 83.)

## III.   Conclusions of Law and Analysis.

### A.   Whether Sanctions Against Plaintiffs Are Warranted Pursuant to Fed. R. Civ. P. 11 or 28 U.S.C. § 1927.

Noting that the AC is Plaintiffs' fourth complaint filed in two cases related to the Jay Peak project,[1] PUB moves for sanctions pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927, arguing that the AC contains false and misleading statements which Plaintiffs had ample opportunity to correct.

---

[1] In *Daccache v. Quiros*, the Southern District of Florida dismissed plaintiffs' amended complaint against PUB and, in doing so, observed that plaintiffs did "not allege that a single Plaintiff invested in Phases I-III and was injured by [PUB's] wrongful activity[]" and that "the only Plaintiffs that can establish that they suffered a cognizable injury are those that invested in Phase VII, because it was the only phase that resulted in a shortfall."  2018 WL 2248409, at *9-10 (S.D. Fla. May 15, 2018) (the "*Daccache* action").

Rule 11 requires an attorney who signs a pleading to certify "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support[,]" Fed. R. Civ. P. 11(b)(3). Section 1927 authorizes sanctions for an attorney who unreasonably and vexatiously multiplies court proceedings.

PUB identifies thirty-five allegations in the AC which it contends are false and which it further claims Plaintiffs knew were false when made because Plaintiffs either had the governing documents in their possession or had received discovery that revealed the true state of the facts. PUB asserts that it promptly notified Plaintiffs of its concerns but Plaintiffs nonetheless filed the AC and their Errata beyond the twenty-one-day safe harbor set forth in Rule 11.[2] PUB points out that this court previously warned Plaintiffs to use caution when "group pleading" and not to combine all plaintiffs and all investors in a particular allegation if, in doing so, the allegation would be false as to part of the collective group. (Doc. 90 at 6.) It points to what it characterizes as four "knowingly false statements[]" previously made to this court.[3] *Id.* at 28.

In opposing PUB's motion for sanctions, Plaintiffs claim their factual allegations are not false, but rather are subject to divergent interpretations.[4] Without admitting a

---

[2] Rule 11 provides a safe harbor prohibiting the filing of a motion for sanctions if the challenged filing is corrected within twenty-one days. *See* Fed. R. Civ. P. 11(c)(2). Plaintiffs filed their Errata on July 11, 2019, approximately two months after they filed the AC, beyond the safe harbor period.

[3] PUB identifies the prior false statements as follows:

1.   PUB was not allowed to release funds from escrow until "U.S. Citizenship and Immigration Services approved the investors' EB-5 applications[.]" (Doc. 62 at 9.)

2.   "In making this investment, Mr. Daccache reviewed and relied on the offering materials for this investment." (Doc. 1 at 33, ¶ 117.)

3.   PUB "was a party to an escrow agreement with each investor." *Id.* at 21, ¶ 71.

4.   "[A]ll the plaintiffs lost $550,000." (Doc. 77 at 79.)

(Doc. 90 at 28.)

[4] Although Plaintiffs requested the court to stay any adjudication of PUB's Rule 11 motion until after discovery or summary judgment, the court has denied that request.

Rule 11 violation, they withdrew three allegations in the original version of the AC and corrected others in their Errata. They claim PUB's counsel has a history of filing unfounded sanctions motions and ask the court to take that history into consideration. The court confines its review to the motion for sanctions pending before it.

PUB's Rule 11 claims fall into nine different categories: (1) allegations concerning the Jay Peak Escrow Agreements; (2) allegations regarding Offering Memoranda; (3) allegations concerning restrictions on transfers to non-bank financial institutions; (4) allegations concerning the transfer of funds; (5) allegations concerning PUB's actual knowledge regarding the use of funds to purchase Jay Peak; (6) allegations that no Limited Partnership funds could be transferred to any other Jay Peak entity; (7) allegations regarding PUB's knowledge of fraud; (8) allegations that investors could not have known of the alleged misconduct; and (9) allegations that Plaintiffs would have acted differently if PUB had disclosed the alleged fraud.

Although each of PUB's categories of concern has a basis in fact, Plaintiffs' responses demonstrate that many of the allegations PUB cites as false are subject to divergent interpretations of supporting evidence or call for a legal conclusion regarding the proper interpretation of a document. The court nonetheless agrees that even when these competing inferences are credited, certain allegations in the AC remain potentially misleading.

For example, Plaintiffs allege PUB "represent[ed] itself to investors as holding a fiduciary role while knowing that Jay Peak was materially deceiving investors by misusing investor funds[.]" (Doc. 78-1 at 71, ¶ 272.) PUB provides a sworn declaration that it made no representations to Plaintiffs and cites the deposition testimony of Plaintiffs Calderwood, Pietri, Daccache, Hiller, and Wang in which they state under oath that they had no direct contact with PUB, did not research PUB or its role, and had not heard of PUB prior to investing. (Doc. 90-1 at 6-8, ¶¶ 4-9.) This undercuts any claim that PUB represented to Plaintiffs that it was acting as a fiduciary prior to their investment.

Plaintiffs allege that "Quiros or Stenger typically instructed [PUB] to release the funds to brokerage accounts controlled by Quiros at the Raymond James brokerage firm." (Doc. 78-1 at 21, ¶ 59.)  PUB cites deposition testimony from its employees in the SEC action that they did not receive direct communications from Mr. Quiros.  PUB also cites evidence that Plaintiffs Calderwood's and Wang's funds were never transferred to Raymond James.  Plaintiffs respond that they alleged either Mr. Quiros "or" Mr. Stenger provided these directions and that they used "typically" to indicate that it did not happen in every case.  Because there is no evidence that Mr. Quiros instructed PUB to transfer Plaintiffs' funds to Raymond James, Plaintiffs' allegation is potentially misleading.

Plaintiffs allege PUB had knowledge of Mr. Quiros's fraud when it "was confronted" with "the revelation" that Mr. Quiros:

> represent[ed] that he had obtained over $20 million in cash to purchase Jay Peak, when he had been incapable of providing financial statements to justify the assumption of less than $3 million in outstanding commercial loans, a business plan, a sources and uses of funds summary, or any other documentation showing how he intended to deploy investor funds consistently with the representations in the offering memoranda.

*Id.* at 28-29, ¶ 86.  PUB points out that Mr. Quiros never applied for a loan from PUB and never provided PUB with personal financial information.  PUB claims it is misleading to state that it knew Mr. Quiros was "incapable" of providing financial information to justify a loan he never sought.  The court agrees.

PUB alleges that Plaintiffs rely heavily on the transfer of funds between various Phases of the Jay Peak projects as fraudulent when the governing documents allegedly permitted such transfers and when both Plaintiff Hiller and Plaintiff Calderwood testified in deposition that they were aware that such transfers were authorized when they invested.  PUB points out that Plaintiffs allege that they:

> . . . reasonably believed, and acted with the understanding that[] [PUB] would comply with its fiduciary duties when they agreed to transfer and did transfer their investments to the [PUB] escrow account and left their money in the escrow account rather than seeking a refund, initiating earlier litigation, or reporting misconduct to law enforcement.

*Id.* at 67, ¶ 255. Plaintiffs further allege that "Plaintiffs and the class members did not and could not have discovered the facts constituting Defendants' violations until the SEC [C]omplaint was made available to the public on April 14, 2016." *Id.* at 63, ¶ 235; *see* Doc. 78-1 at 63, ¶ 237 ("Because Plaintiffs and the Class could not have reasonably discovered the facts constituting Defendants' violations until April 14, 2016, their claims accrued on that date and all applicable statutes of limitation were tolled until that date."). PUB contends that all of these allegations are false because it did not enter into escrow agreements with individual investors beyond an initial deposit agreement for a temporary time period during which the potential investor conducted due diligence and once an investor's funds were released from escrow to the Limited Partnership, any obligations it had as an escrow agent were discharged. Although the court agrees that Plaintiffs' allegations cover an unspecified time period, Plaintiffs' error is one of generalization and lack of specificity as opposed to an obvious falsehood.

With regard to Plaintiffs' claim that they did not discover the alleged fraud until the SEC Complaint was made public, PUB points out that Plaintiffs' Errata reflects Plaintiff Pietri's knowledge of the SEC inquiry in March of 2014 and Plaintiff Daccache had direct communications with the SEC starting in September 2015. PUB argues that Plaintiffs Wang, Casseres-Pinto, and Hiller and other investors similarly admit they were aware of the SEC's inquiry well in advance of April 2016 and that these investors or their counsel were aware of and received a February 2012 Rapid Visa email in which concerns regarding the Jay Peak projects were raised. PUB points out that by June 2015, it was widely reported that Jay Peak was being investigated by the SEC and the State of Vermont. For this reason, PUB contends that Plaintiffs' assertion that they did not discover their injuries and their cause until the SEC Complaint was made public is false. The court agrees that Plaintiffs' allegation that each Plaintiff discovered his injury and its cause only when the SEC Complaint was made public is not wholly accurate.

Under Fed. R. Civ. P. 11(c), the court may sanction a party "if [it] determines that the party has violated Rule 11(b) by making false, misleading, improper, or frivolous representations to the court." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d

11

Cir. 2008). "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement." *Kiobel v. Millson*, 592 F.3d 78, 83 (2d Cir. 2010) (internal quotation marks omitted). "The mental state applicable to liability for Rule 11 sanctions initiated by motion is objective unreasonableness, *i.e.*, liability may be imposed if the lawyer's claim to have evidentiary support is not objectively reasonable." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003). This applies, however, only when there has been an opportunity "to correct or withdraw the challenged submission." *Id.*

"A sanction imposed under . . . [R]ule [11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). The court retains discretion over whether to impose a sanction even if it finds a violation. *See Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004) ("Even if the district court concludes that the assertion of a given claim violates Rule 11, . . . the decision whether or not to impose sanctions is a matter for the court's discretion.").

The Advisory Committee Notes to Rule 11's 1993 Amendment identifies factors to consider when contemplating Rule 11 sanctions:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants[.]

Fed. R. Civ. P. 11 Advisory Committee Notes, 1993. If the court finds that an attorney acted in subjective good faith, no Rule 11 sanction is warranted. *In re Pennie & Edmonds LLP*, 323 F.3d at 93.

In this case, the court agrees with PUB that Plaintiffs should have been more careful in drafting the AC and that several of their allegations may give rise to a

misleading impression of the operative facts. It further agrees that Plaintiffs were on notice regarding prior pleading problems and that their attorneys are experienced and trained in the law.

On the other hand, Plaintiffs withdrew three allegations and corrected others in their Errata. Neither Plaintiffs nor their attorneys evince an intent to injure either Defendants or the administration of justice. The problematic allegations are among a vast number of other allegations so that the court cannot find that, as a whole, the AC is frivolous, objectively unreasonable, or false. Plaintiffs' counsel represents that they acted in subjective good faith, and the court credits that representation.

Based on the foregoing, although the court finds PUB's motion was not unfounded, the court declines to find a Rule 11 violation or impose sanctions at this time. In doing so, it cautions Plaintiffs and their counsel to refrain from unduly generalized, partially accurate, or potentially misleading statements in any further filing with this court. The court therefore DENIES PUB's motion for sanctions. (Doc. 90.)

**B.    Whether to Grant the Law Firm Defendants' Motion to Dismiss.**

The Law Firm Defendants seek dismissal of Plaintiffs' claims on a number of grounds. First, they contend that Plaintiffs assert derivative claims for which they do not have standing. Second, they contend that Plaintiffs do not allege a plausible duty, breach, or causation. And finally, for each claim, they assert that Plaintiffs fail to state a claim for which relief may be granted. The fulcrum of Plaintiffs' claims against the Law Firm Defendants turns on whether the Law Firm Defendants owed Plaintiffs a duty, breached that duty, and caused their injuries. The court addresses that issue first as both a challenge to Plaintiffs' standing and a challenge to whether the Law Firm Defendants had a duty of disclosure.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff must have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical," and (c) there must be "a causal connection between the injury and the conduct complained

13

of[.]" *Id.* (citations and internal quotation marks omitted).  Where standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," a plaintiff will have a "substantially more difficult" burden to establish standing.  *Id.* at 562 (internal quotation marks omitted).

The Phase VIII Plaintiff alleges claims against the Law Firm Defendants predicated on a legal theory that the Law Firm Defendants had a duty to disclose their clients' alleged wrongdoing to state regulators and that, had they done so, Phase VIII investors would not have been injured because state regulators would have not authorized the Phase VII and Phase VIII Jay Peak projects to go forward.  The AC's allegations pertaining to the Law Firm Defendants are relatively sparse and generally conclusory. For example, Plaintiffs allege that the Law Firm Defendants had "actual knowledge" of Mr. Quiros's fraudulent scheme and provided "substantial assistance to the fraud" by representing their clients in response to subpoenas, at depositions, and in sending a February 27, 2015 letter to the Vermont DFR.  (Doc. 78-1 at 73, ¶ 280.)  Plaintiffs claim that the Law Firm Defendants had a "professional duty to speak accurately and completely to the government, including in response to the Vermont DFR's investigation" *id.* at 73, ¶ 281, and that the Vermont DFR relied on the Law Firm Defendants' "misrepresentations[]" in approving Mr. Quiros's "offering materials to raise millions of dollars in EB-5 funds for Phase VII and Phase VIII." *Id.* at 74, ¶ 285.

The AC alleges no misrepresentations made by the Law Firm Defendants to Plaintiffs, no privity of contract between them, no reliance by Plaintiffs, and no special relationship.  The AC further does not allege that Plaintiffs knew of the Law Firm Defendants' alleged misrepresentations to the Vermont DFR or that the Phase VIII Plaintiff invested based on those alleged misrepresentations.  Instead, Plaintiffs assert that the Law Firm Defendants became "culpable actor[s] in the fraud" by representing their clients. *Id.* at 73, ¶ 282.  This is a novel theory of liability which no court has apparently endorsed. *See F.D.I.C. v. U.S. Mortg. Corp.*, 132 F. Supp. 3d 369, 387 (E.D.N.Y. 2015) (noting that plaintiff "cites to no controlling authority for the existence of such an

14

expansive duty, and the Court's own research has revealed none. Actually, the prevailing law appears to dictate a far narrower approach—one that insulates attorneys from liability for all but the most overt actions which are designed specifically to induce third-parties' reliance"). *See also Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469, 475 (4th Cir. 1992) (refusing to recognize "[a]n omnipresent duty of disclosure" as that would "not only be unfair to law firms; it would destroy incentives for clients to be forthcoming with their attorneys and would artificially inflate the cost of involving legal counsel in commercial ventures[]").

The Vermont Supreme Court has affirmatively rejected a general duty extending from an attorney to a third-party who claims to be injured by virtue of the attorney's representation of his or her client in the absence of privity of contract, a special relationship, or intended third-party beneficiary status. *See Hedges v. Durrance*, 2003 VT 63, ¶¶ 6, 9, 175 Vt. 588, 590, 834 A.2d 1, 4 (recognizing "the longstanding common-law rule" that "an attorney owes a duty of care only to the client and not to third parties[]" and noting that "[a] dramatic expansion of the requirements regarding privity and duty of care would have profound consequences"); *Bovee v. Gravel*, 811 A.2d 137, 140 (Vt. 2002) (rejecting a duty extending from a corporation's attorney to the corporation's shareholders and dismissing claims arising from attorney's representation of corporation). Plaintiffs' attempts to cast the Law Firm Defendants as *participants* in the fraud, as opposed to advocates for their clients, does nothing to advance their claims. While an attorney may be sued for fraud, Plaintiffs do not claim that the Law Firm Defendants defrauded *them*. Instead, their sole claim is that the Law Firm Defendants defrauded third parties that are not before the court. Whether analyzed as a question of standing or failure to state a claim, those allegations will not suffice. *See Schwartz v. Frakenhoff*, 733 A.2d 74, 82 (Vt. 1999) (dismissing claims against attorneys based upon representation of their clients and holding that "[a]n attorney is not liable in tort to a nonclient simply because the lawyer represents a tortfeasor; some independent wrong committed by the attorney [against the third-party] rather than [by] the client is a prerequisite to the attorney's personal liability to such a third party[]"); *see also U.S.*

15

*Mortg. Corp.*, 132 F. Supp. 3d at 382 (rejecting claim of fraud based upon attorney's representation and noting that "[g]enerally, fraud can be established in two ways, namely, by affirmatively making a false representation or by failing to discharge a duty of disclosure[]"); *Lujan*, 504 U.S. at 562 (ruling that standing is difficult to establish when the plaintiff has not been injured by the defendant but instead traces his harm to a third-party with whom the defendant is allegedly connected).

Although Plaintiffs contend the Law Firm Defendants had a duty to disclose their clients' alleged wrongdoing, the law is to the contrary except in circumstances not present in this case. *See Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir. 1986) ("Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose. To the contrary, attorneys have privileges not to disclose") (citations omitted). Plaintiffs gain no traction by alleging the Law Firm Defendants breached their ethical duties in their dealings with government regulators. No independent cause of action lies for breach of an ethical duty. *See Schatz v. Rosenberg*, 943 F.2d 485, 492 (4th Cir. 1991) (observing that "[c]ourts have consistently refused to use ethical codes to define standards of civil liability for lawyers[]" because "ethical rules were intended by their drafters to regulate the conduct of the profession, not to create actionable duties in favor of third parties").

More importantly, Plaintiffs' theory of standing and causation relies entirely on speculation as to what the Vermont DFR would have done had it been presented with different information. Standing that "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict[]" *Lujan*, 504 U.S. at 562, is exceedingly difficult to establish. Plaintiffs fare no better with their attempt to establish causation. Under Vermont law,

> [C]ausation requires both but-for and proximate causation. But-for causation requires a showing that the harm would not have occurred but for the defendant's conduct such that the tortious conduct was a necessary condition for the occurrence of the plaintiff's harm. Proximate cause, on the other hand, requires a showing that the defendant's [tortious conduct]

16

> was legally sufficient to result in liability in that the injurious consequences flowed from the defendant's conduct and were not interrupted by some intervening cause. And, [a]lthough proximate cause ordinarily is characterized as a jury issue, it may be decided as a matter of law where the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way.

*Palmer v. Furlan*, 2019 VT 42, ¶ 8, 215 A.3d 109, 112-13 (citations and internal quotation marks omitted) (alterations in original).

The Vermont Supreme Court has rejected, as a matter of law, causation that depends upon "speculat[ion] as to 'how [government actors] make decisions and what decisions they reasonably would have made in the[] circumstances.'" *Id.* at ¶ 9, 215 A.3d 109, 113 (dismissing claim against attorney for malpractice which required speculation as to how a court would have handled a stipulation). That is precisely the type of causation Plaintiffs allege here—a speculative prediction as to how a governmental agency might have reached a different decision had the Law Firm Defendants disclosed their clients' alleged fraud.

In the absence of pleading a plausible duty of disclosure and causation, Plaintiffs' claims against the Law Firm Defendants, regardless of how framed, must fail. *See U.S. Mortg. Corp.*, 132 F. Supp. 3d at 383 (observing that a plaintiff "must allege [the] facts giving rise to a duty to disclose with the specificity required by Rule 9(b)[]" and noting that "the Second Circuit has 'vigorously enforced Rule 9(b)' where, as here, allegations of fraud . . . are made against professionals, such as attorneys.") (internal quotation marks omitted) (first alteration in original).

For the foregoing reasons, the court GRANTS the Law Firm Defendants' motion to dismiss based upon standing, Fed. R. Civ. P. 1, and failure to plausibly allege duty and causation. Fed. R. Civ. P. 12(b)(6). (Doc. 86.) It thus does not reach the Law Firm Defendants' alternative argument that Plaintiffs' claims are derivative.

17

### C.    Whether to Grant PUB's Motion to Dismiss.

#### 1.    Whether the AC Plausibly Alleges Standing.

PUB moves to dismiss the AC for failure to allege standing, arguing that Plaintiffs allege injuries caused by parties not before the court which are not plausibly attributed to PUB.  Because Plaintiffs identify at least one factual and legal basis for a duty extending from PUB to them, the court must analyze whether Plaintiffs satisfy the "low threshold" of injury-in-fact, *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008), and whether Plaintiffs shoulder the "relatively modest" burden to plausibly allege that their injuries are "fairly traceable" to PUB's alleged conduct and "not the result of the independent action of some third party not before the court[.]"  *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013) (brackets, omissions, emphasis, and internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 560-61).  Plaintiffs "need not be capable of sustaining a valid cause of action," *Ross*, 524 F.3d at 222 (internal quotation marks omitted), and even "harms that flow indirectly from the action in question" may be adequate.  *Rothstein*, 708 F.3d at 92 (internal quotation marks omitted).

Because each Plaintiff has alleged at least some injury-in-fact traceable to PUB arising out of PUB's acts and omissions as an escrow agent, Plaintiffs have plausibly alleged standing at the pleading stage.  As the case progresses, the requisite showing to establish standing will increase.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("[T]he showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds.") (citing *Lujan*, 504 U.S. at 561).  The court therefore DENIES PUB's motion to dismiss on standing grounds.  *See* Fed. R. Civ. P. 12(b)(1).

#### 2.    Whether Plaintiffs Plausibly Allege Causation.

PUB also challenges whether Plaintiffs plausibly allege causation, arguing that Plaintiffs are not similarly situated and cannot all allege the same injuries.  For example, with regard to Plaintiffs Calderwood, Daccache, and Wang, although the AC asserts that each of these Plaintiffs "has not received any of his $550,000 in damages, prejudgment interest, additional damages available by law (including treble and punitive damages), or

the value of his consideration" (Doc. 78-1 at 60-61, ¶¶ 221-22, 228), PUB points out that
each of these Plaintiffs received a Limited Partnership interest as well as a "green card"
which PUB contends is exactly what they bargained to receive. (Doc. 85 at 14) (internal
quotation marks omitted).

With regard to Plaintiff Wang, PUB contends that because he invested in Phase
VIII in December of 2015, he cannot complain that he was injured by acts and omissions
that took place prior to his investment with regard to Phase I and Phase II. Instead, he
must plausibly allege that PUB's acts or omissions directly and proximately caused harm
to his investment in Phase VIII.

In the case of Plaintiffs Qureshi, Casseres-Pinto, Hiller, and Pietri, PUB argues
that these investors "redeployed" the full amount of their investments to LCP One Wall
Street LLC, another EB-5 investment, which did not charge them any administrative
fees.[5] (Doc. 85 at 16) (internal quotation marks omitted). PUB thus contends there is no
plausible basis for their claim that they are entitled to recover administrative fees paid to
the Jay Peak entities as damages from PUB.

Finally, PUB points out that the Receiver has settled the SEC action and is
pursuing claims on behalf of the Limited Partnerships based upon many of the same
facts. PUB contends that Plaintiffs' claims for damages must reflect the recovery in the
SEC action and must segregate out damages suffered by the Limited Partnerships as a
whole. Because Plaintiffs bring suit as individuals as well as class representative, they
must each plausibly allege causation and damages.

Plaintiffs respond that they are not required to allege their damages with precision
at the pleading stage, nor are they required to provide a full accounting of any monies
they have received in settlements with other parties. Provided they plausibly allege that
PUB caused them *some* injury, they contend they should be allowed to proceed with their

---

[5] PUB cites LCP One Wall Street LLC's website for the proposition that EB-5 required
investment fees "typically no greater than $53,000." (Doc. 85 at 16 n.4) (internal quotation
marks omitted). In the absence of a request to take judicial notice of the website, the court does
not consider this information.

claims against it. This is true of many of Plaintiffs' claims, but it is not accurate with regard to their fraud claim.

Under Vermont law,

> In cases of fraud, the deceived party has two options: rescind the agreement and recover the price paid or[] . . . stand on the contract and seek recovery of either the damages incurred by the fraud or the damages resulting from the breach of contract. Plaintiff's measure of damages in an action for fraud is the net amount of the money he has actually lost as a result of the fraud practiced on him. . . . Damage recovery in cases of fraud and deceit is restricted in all cases to such damages as were the natural and proximate consequences of the fraud, and to such damages as can be clearly defined and ascertained.

*Smith v. Country Vill. Int'l, Inc.*, 2007 VT 132, ¶ 8, 183 Vt. 535, 536-37, 944 A.2d 240, 243 (citations, alterations, and internal quotations marks omitted). A plaintiff who does not seek to set aside the transaction must therefore be prepared to establish what his or her investment would have been worth but for the fraud or face dismissal of the claim. *Id.* In pursuing a fraud claim, a plaintiff must thus allege not only transaction causation but loss causation as well.[6]

Transaction causation requires a plaintiff to plausibly allege that they "would not have invested . . . *but for* Defendants' misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 (2d Cir. 2015). In contrast, loss causation requires a plaintiff to allege a "fraudulent statement that induced [the plaintiff]

---

[6] For fraud claims brought pursuant to a federal statute or under state common law, the Second Circuit has left open the question of whether loss causation must be pleaded with particularity. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 182-83 (2d Cir. 2015). Without deciding the question, it has described the pleading burden as "not a heavy one[]" and has opined that "[t]he complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id.* at 187. The Second Circuit has observed that "[w]hat sort of pleading is sufficient will depend on the factual circumstances of the case[]" and "the chain of causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.* (internal quotation marks omitted). "The requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations[]" and "Plaintiffs must only allege enough facts regarding their loss to support the inference that they would have been spared all or an ascertainable portion of that loss absent the fraud." *Id.* at 189 (emphasis and internal quotation marks omitted).

to invest [that] . . . made her investment, in fact, more disposed to suffer the alleged harm[] . . . than honestly described alternative investments." *Id.* In other words, a plaintiff must allege how his investment was damaged by the fraud in comparison to what it would be worth in its absence. If the value of the investment decreased for other reasons, that amount is not included in loss causation. The AC, as currently framed, alleges transaction causation but does not allege loss causation.

For example, Plaintiffs have alleged damages that would allow them to both retain the benefits of their bargain and obtain repayment of all of the consideration they have paid to date. However, under Vermont law, each Plaintiff can recover only those damages that "will compensate him for the loss or injury actually sustained and place him in the same position that he would have occupied had he not been defrauded." *Larochelle v. Komery*, 261 A.2d 29, 33 (Vt. 1969).

In this case, generalized claims whereby Plaintiffs seek to retain all benefits of their bargain as well as to recover all consideration paid, although sufficient for standing purposes, do not plausibly plead loss causation and damages. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) ("[I]n addition to showing that but for the defendant's misrepresentations the transaction would not have come about, the [plaintiff] must also show that the misstatements were the reason the transaction turned out to be a losing one."); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173-74 (2d Cir. 2005) (ruling that "the pleading principles . . . require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk[]" and if the plaintiff fails to allege "a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie[]") (citation and internal quotations marks omitted). Loss causation need not be alleged with mathematical certainty, but it must comport with Vermont law. With regard to their fraud claims, Plaintiffs seek to obtain both forms of recovery available under Vermont law which does not permit that result. *See Smith*, 2007 VT 132, ¶ 8, 183 Vt. at 536, 944 A.2d at 243 ("In cases of fraud, the deceived party has two options: rescind the agreement and recover the price paid or[] . . . stand on the contract and seek recovery

21

of . . . the damages incurred by the fraud").

With regard to their non-fraud claims, Plaintiffs are correct that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, and their recoveries on settlements in other cases do not bar their recovery but merely "should be set off against any recovery Plaintiff receives[.]" *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 514 (S.D.N.Y. 2006) (ruling recovery in a separate lawsuit did not bar plaintiff from pursuing a RICO claim under the "one satisfaction" double recovery rule).

For the foregoing reasons, PUB's motion to dismiss the AC is GRANTED as to Count II (aiding and abetting fraud) on the ground that Plaintiffs have not plausibly alleged loss causation and damages and DENIED with regard to Plaintiffs' remaining claims insofar as PUB seeks dismissal for failure to plausibly plead causation.

### 3. Whether Plaintiffs' Claims Against PUB Are Barred by the Statute of Limitations.

PUB argues that the applicable statute of limitation bars Plaintiffs Calderwood's and Daccache's claims because they invested their funds in Phase II on July 17, 2008, and in Phase III on August 13, 2010, respectively, and thus any injury sustained is well beyond the six-year limitations period. PUB further asserts that if Plaintiffs Calderwood and Daccache seek to take advantage of equitable tolling, they have failed to plead with particularity that PUB fraudulently concealed its wrongdoing.

Plaintiffs counter that they allege that Plaintiffs Calderwood and Daccache discovered their injuries no earlier than when the SEC Complaint was made public on April 14, 2016, well within the limitations period. They assert that PUB actively and fraudulently concealed evidence of its wrongdoing by failing to make disclosures and falsely assuring investors that Jay Peak was in good standing.

The statute of limitations is an affirmative defense that may be raised "in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). The party asserting the defense bears the burden of "establish[ing] when a . . . claim accrues." *Gonzalez v.*

22

*Hasty*, 651 F.3d 318, 322 (2d Cir. 2011). "Unless the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 354 (D. Vt. 2010) (alteration omitted) (quoting *Foss v. Bear, Stearns & Co.*, 394 F.3d 540, 542 (7th Cir. 2005)).

Plaintiffs' claims are generally subject to a six-year statute of limitations, *see* 12 V.S.A. § 511 ("A civil action[] . . . shall be commenced within six years after the cause of action accrues and not thereafter."); however, Vermont has adopted a discovery rule for determining when a cause of action accrues. *See Univ. of Vt. v. W.R. Grace & Co.*, 565 A.2d 1354, 1357 (Vt. 1989) ("We now reaffirm the 'uniform rule' . . . and hold specifically that the discovery rule should be read into § 511."). "[A] cause of action accrues when the plaintiff knows of or reasonably should have discovered the injury and its cause." *State v. Atl. Richfield Co.*, 2016 VT 61, ¶ 33, 202 Vt. 212, 225, 148 A.3d 559, 568. The applicable test requires a plaintiff to act with reasonable diligence and does not excuse willful ignorance:

> [A] cause of action is generally said to accrue upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery. Thus, the statute of limitation begins to run when the plaintiff has notice of information that would put a reasonable person on inquiry, and the plaintiff is ultimately chargeable with notice of all the facts that could have been obtained by the exercise of reasonable diligence in prosecuting the inquiry.

*Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 7, 186 Vt. 605, 607, 987 A.2d 258, 262.

"Precisely when [a] plaintiff's cause of action accrued [may] require factual development at trial." *Univ. of Vt.*, 565 A.2d at 1357; *see also Clarke v. Abate*, 2013 VT 52, ¶ 10, 194 Vt. 294, 299, 80 A.3d 578, 581 ("We have repeatedly and consistently emphasized that the question of when an injury reasonably should have been discovered is one of fact to be determined by the jury.") (internal quotation marks omitted). "Hence, the court rather than the jury may determine the accrual-date issue only when there is no legally sufficient evidentiary basis" for a contrary conclusion. *Clarke*, 2013 VT 52, at ¶ 10, 194 Vt. at 299, 80 A.3d at 581 (internal quotation marks omitted).

In the AC, Plaintiffs allege a discovery date triggered by the public disclosure of the SEC Complaint which brings the claims of Plaintiffs Calderwood and Daccache within the applicable statute of limitations. PUB's argument that Plaintiffs were on inquiry notice long before this date requires a weighing of evidence and a determination of credibility that are not appropriate in adjudicating a motion to dismiss. *See Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 155 (2d Cir. 2006). PUB's statute of limitations defense thus does not warrant dismissal of Plaintiffs Calderwood's and Daccache's claims at this time.

With regard to fraudulent concealment, however, PUB has a more persuasive argument. Vermont law recognizes fraudulent concealment as a basis for tolling the statute of limitations in certain circumstances. *See* 12 V.S.A. § 555 ("When a person entitled to bring a personal action is prevented from so doing by the fraudulent concealment of the cause of such action by the person against whom it lies, the period prior to the discovery of such cause of action shall be excluded in determining the time limited for the commencement thereof."). In order for fraudulent concealment to apply, Plaintiffs must plausibly allege "(1) wrongful concealment by [PUB], (2) which prevented investors[] [Calderwood's and Daccache's] discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998). Generalized allegations that "Defendants" actively concealed their "wrongdoing" cannot be credited. In addition, the AC is bereft of any reference to Plaintiffs' due diligence, including "when such inquiries were made, to whom, regarding what, and with what response." *Id.*

Because the AC does not plausibly plead with particularity fraudulent concealment, equitable tolling is not available to Plaintiffs. *See Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) ("A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Fed. R. Civ. P. 9(b)[.]"); *Fercenia v. Guiduli*, 2003 VT 50, ¶¶ 14-15, 175 Vt.

541, 545, 830 A.2d 55, 59-60 (holding allegations of fraudulent concealment must be pled with particularity).

For the reasons stated above, the court DENIES PUB's motion to dismiss on statute of limitations grounds and GRANTS it with regard to Plaintiffs' fraudulent concealment claim.

### 4.    Whether Plaintiffs Allege a Breach of Fiduciary Duty Claim.

In the AC, Plaintiffs allege a breach of fiduciary duty on behalf of the Jay Peak Class against PUB based on PUB's alleged fiduciary duty arising out of "escrow relationships with investors." (Doc. 78-1 at 66, ¶ 251.) Plaintiffs describe their claim as follows:

> 255. [PUB] directly caused Plaintiffs' injuries by breaching the fiduciary duties it owed to them in its capacity as their escrow agent. As an escrow agent, [PUB] had fiduciary duties including but not limited to (1) a duty to comply with the terms of the Investor Escrow Agreement, including the Limited Partnership Agreement incorporated by reference, (2) a duty to investigate suspicious conduct by Jay Peak that reasonably demonstrated a likelihood that escrow funds were being misused or misappropriated, and (3) a duty to notify Plaintiffs of any conduct by [PUB] that put them at risk for harm in connection with the subject matter of the escrow agreement. Plaintiffs reasonably believed, and acted with the understanding that, [PUB] would comply with its fiduciary duties when they agreed to transfer and did transfer their investments to the [PUB] escrow account and left their money in the escrow account rather than seeking a refund, initiating earlier litigation, or reporting misconduct to law enforcement.
>
> 256. [PUB] breached its duty to comply with the Investor Escrow Agreements by disbursing escrow funds to unauthorized accounts. Had [PUB] not made these disbursements, the Jay Peak scheme would not have been perpetuated through the date of Plaintiffs' investments, and Plaintiffs would not have suffered their losses.
>
> 257. [PUB] breached its duty to investigate by failing to investigate and respond appropriately to Jay Peak's fraudulent behavior of requesting that it execute unauthorized transactions, as well as failing to investigate based on external reports of misconduct by Jay Peak. [PUB] also breached its duty of disclosure by failing to disclose to Plaintiffs Jay Peak's unauthorized transactions with investor funds, the external reports it had received of Jay Peak misconduct, and the results of the investigation it should have conducted based on its actual knowledge. Had [PUB] complied with its

duties, the Jay Peak scheme would not have been perpetuated through the date of Plaintiffs' investments, and Plaintiffs would not have suffered their losses.

*Id.* at 67-68, ¶¶ 255-57.

PUB seeks dismissal of Plaintiffs' breach of fiduciary duty claim, asserting that it served as an escrow agent for only a brief period of time, it complied with the terms of the escrow agreements, and it made no representations to Plaintiffs that would give rise to any other duty or a breach thereof. With regard to Plaintiff Calderwood, PUB points out that it is undisputed that he never signed an escrow agreement and his claim that he "understood" PUB was acting as the Phase II escrow agent when he wired $550,000 to a PUB account is not plausible because it is based on an email which he was not aware of prior to his investment.

With regard to its alleged duty of disclosure, PUB argues that because Plaintiffs invested at different times and pursuant to different escrow agreements, all of which had a limited term, the mix of facts that PUB allegedly should have disclosed was not uniform throughout the relevant period. For example, PUB argues that Plaintiffs "appear to be arguing only that the transfer of Phase I and II funds to Raymond James in June 2008 was improper and should have been disclosed to all plaintiffs" (Doc. 113 at 12); however some of the Plaintiffs were not investors at the time and their funds were not involved in this allegedly improper transfer. PUB cites several other examples of how Plaintiffs are not similarly situated, although it does not affirmatively challenge Plaintiffs' continued use of group pleading.

PUB cites evidence that Plaintiffs possessed alternative sources of disclosure and thus did not reasonably rely on PUB as a source of information. However, that argument would not, as a matter of law, excuse a duty to disclose in the context of a fiduciary relationship. *See Powell v. H.E.F. P'ship*, 793 F. Supp. 91, 93 (D. Vt. 1992) (ruling escrow agent had an obligation "to disclose information about a known fraud"). In any event, the deposition testimony PUB relies on is not before the court. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (noting that where materials outside the

26

pleadings are offered on a motion to dismiss, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material") (internal quotation marks omitted).

Plaintiffs respond that the material terms of their escrow agreements were the same and that each escrow agreement incorporated the terms of the corresponding Limited Partnership Agreement by reference.[7] Plaintiffs further allege that PUB had knowledge of the alleged fraud as well as the ability to protect investors. Finally, Plaintiffs allege that had PUB disclosed third-party fraud to them, Plaintiffs would not have suffered damages.

Under Vermont law, a breach of fiduciary duty requires a plaintiff to plausibly allege "(1) [the defendant] owed [the plaintiff] a fiduciary duty; and (2) that duty required [the defendant] to act in good faith and with loyalty for the advancement of [the plaintiff's] interests." *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 10, 188 Vt. 245, 252, 6 A.3d 701, 706. An escrow agent generally has a fiduciary duty to an individual that deposits funds in escrow to act in strict compliance with the terms of the escrow agreement and to disclose known fraud. *See George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F. Supp. 381, 386 (S.D.N.Y. 1991) ("[U]pon acceptance of the agreement, the escrow agent has the duty of strict execution of its terms and conditions[] . . . [and] is charged with the duty not to deliver the escrow deposit to anyone except upon strict compliance with the conditions imposed[.]") (citations, brackets, and internal quotation marks omitted); *see also Powell*, 793 F. Supp. at 93 (ruling that defendant "owed a fiduciary duty to plaintiffs because[] . . . it acted as plaintiffs' agent by holding the purchase money in an escrow account pending closing. . . . Regardless of the

---

[7] *See* Doc. 78-1 at 67, ¶ 252 ("[PUB] breached its fiduciary duties to Plaintiffs and the Class, both under the express terms of the investor escrow agreements and as provided by law."); *id.* at ¶ 255 ("As an escrow agent, [PUB] had fiduciary duties including but not limited to . . . a duty to comply with the terms of the Investor Escrow Agreement, including the Limited Partnership Agreement incorporated by reference[.]").

27

agreement's express terms, . . . an escrow agent's duty to its principal includes the obligation to disclose information about a known fraud being committed on the principal."). This is because, under Vermont law, "[a] fiduciary duty of loyalty is implied in every agency as a matter of law." *In re Estate of Kurrelmeyer*, 2006 VT 19, ¶ 17, 179 Vt. 359, 369, 895 A.2d 207, 215. In general, "the duty of loyalty does not survive termination of an agent's employment." *Foster & Gridley v. Winner*, 740 A.2d 1283, 1287 (Vt. 1999).

In the AC, Plaintiffs allege that PUB, contemporaneous with its status as an escrow agent, failed to disclose known fraud, commingled funds, improperly released funds from escrow, and failed to investigate facts that, if disclosed, would have protected investors from harm. If established, these facts plausibly allege a breach of fiduciary duty to disclose known fraud because "[t]he test of liability for failure to disclose facts material to the transaction is some duty, legal or equitable, arising from the relations of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge." *Powell*, 793 F. Supp. at 94-95 (quoting *Newell Bros. v. Hanson*, 123 A. 208, 210 (Vt. 1924) (internal quotation marks omitted)).

Although as an escrow agent PUB had no duty "to actively root out fraud of which it had no knowledge" or "to police [the] conduct" of other parties, *Schultz v. R.I. Hosp. Tr. Nat'l Bank*, 94 F.3d 721, 729 (1st Cir. 1996), in the AC, Plaintiffs allege that PUB not only knew of the alleged fraud committed by Mr. Quiros and Mr. Stenger, but actively concealed that fraud from investors. Although PUB disputes that claim, the court does not weigh the competing evidence on a motion to dismiss. *See Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017) ("[I]t is not our task at the motion to dismiss stage to weigh the evidence and evaluate the likelihood that [the plaintiff] would prevail[.]"). Whether Plaintiffs' breach of fiduciary duty claim will be supported by the evidence must thus await further development. *See Phones Plus, Inc. v. The Hartford Fin. Servs. Grp., Inc.*, 2007 WL 3124733, at *6 (D. Conn. Oct. 23, 2007) (denying motion to dismiss and observing "questions of fiduciary status, responsibilities, and

28

breaches involve questions of fact[,]" and plaintiff had alleged "facts which, taken as true, articulate a plausible claim for relief").

Because Plaintiffs plausibly allege a breach of fiduciary duty claim in Count I of the AC, PUB's motion to dismiss that claim is DENIED.

### 5.    Whether Plaintiff Calderwood's Breach of Fiduciary Duty Claim Should be Dismissed.

In terms of the claim asserted by Plaintiff Calderwood, as PUB points out, he does not plausibly allege a breach of fiduciary duty based upon a written escrow agreement because it is undisputed that he did not sign a written escrow agreement prior to his investment. *See Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389, 396 (7th Cir. 2014) (rejecting claim of fiduciary duty based on an escrow agreement that plaintiffs "never even saw" during the time period at issue, "let alone signed it."). PUB's motion to dismiss Plaintiff Calderwood's claim insofar as it depends on a written escrow agreement is therefore GRANTED.

To the extent Plaintiff Calderwood frames his claim as one based upon an implied contract, that claim is not subject to dismissal. *See* Doc. 78-1 at 25, ¶¶ 71-72. Although PUB argues that Plaintiff Calderwood's claim that he relied on PUB's status as a fiduciary in making his investment is false, the court is not permitted to discount the credibility of Plaintiff Calderwood's allegation in adjudicating a motion to dismiss. *See Montagno v. City of Burlington*, 2017 WL 2399456, at *7 (D. Vt. June 1, 2017) (observing that in ruling on a motion to dismiss, "the court does not evaluate the credibility of the Complaint's factual allegations.").

Under Vermont law, "[c]ontracts implied in fact are based upon an actual agreement of the parties, deduced by the trier from the conduct of the parties and the circumstances of the case." *Underhill v. Rutland R.R. Co.*, 98 A. 1017, 1021 (Vt. 1916). In the AC, Plaintiffs allege that Plaintiff Calderwood deposited his investment into a "Phase II escrow account" at PUB and that PUB "accepted [his] deposit into escrow, even though the Phase II Limited Partnership had not been formally registered under Vermont law." (Doc. 78-1 at 25, ¶ 73.) Crediting these factual allegations as true, they

29

adequately allege the contours of an implied contract claim. *See Mount Snow Ltd. v. ALLI, the All. of Action Sports*, 2013 WL 4498816, at *8 (D. Vt. Aug. 21, 2013) ("To prevail on a contract implied in fact claim, a plaintiff must demonstrate mutual intent to contract and acceptance of the offer[]" and noting "mutuality of intent and offer and acceptance are the same elements as required for an express contract[]"). Because Plaintiff Calderwood plausibly alleges an implied contract pursuant to which PUB agreed to act as his escrow agent, PUB's motion to dismiss Plaintiff Calderwood's breach of fiduciary duty based upon an implied contract claim is DENIED.

### 6. Whether Plaintiffs' Aiding and Abetting and Civil Conspiracy Claims are Derivative and Must be Dismissed on that Basis.

In the AC, Plaintiffs assert claims against PUB for aiding and abetting fraud (Count II), aiding and abetting breach of fiduciary duty (Count III), civil conspiracy (Count VI), and aiding and abetting a violation of Vermont's Consumer Protection Act (Count VII). For each of these claims, Plaintiffs allege that each investor suffered the same harm in the same manner.[8] PUB contends that Plaintiffs' claims are all based upon harms inflicted upon the Limited Partnerships and investors as a whole and not upon Plaintiffs specifically. It thus contends that Plaintiffs' remaining claims are derivative and cannot be the subject of a direct action. PUB notes that the *Daccache* court reached this same conclusion and ruled that the plaintiffs there did not have standing to assert any

---

[8] *See, e.g.*, Count II, Doc. 78-1 at 68-69, ¶¶ 260, 263 ("[PUB] acted recklessly and in bad faith towards investors[]" and "substantially assisted Jay Peak in perpetrating its unlawful scheme . . . thereby depriving [investors] of the opportunity to take measures to protect their interests."); Count III, *id.* at 70-72, ¶¶ 268, 270, 272, 274 ("Each of the General Partners owed fiduciary duties to the investors in the respective Limited Partnerships. . . . Each of the General Partners breached the fiduciary duties owed directly to the Limited Partners[.] . . . [PUB] substantially and knowingly assisted the General Partners' breaches of fiduciary duty[.] . . . As a result of the breaches of fiduciary duties directly owed to the investors by the General Partners, Plaintiffs and the Class suffered damages."); Count VI, *id.* at 79, ¶ 313 ("As a direct and proximate consequence of Defendants' conspiracy and overt acts in furtherance thereof, Plaintiffs and the Class have lost money that they invested in the Limited Partnerships[]" and "Defendants' conspiracy[] . . . served to induce foreign investors[] . . . to invest large sums of money in the Limited Partnerships."); Count VII, *id.* at 82, ¶ 328 ("As a direct and proximate consequence of [PUB's] wrongful conduct, each of the Jay Peak Class members invested in excess of $500,000 in the fraudulent Ponzi scheme, and were thereby damaged.").

claims arising from the improper use of the funds once their funds were transferred to the limited partnerships. *See Daccache v. Quiros*, 2018 WL 2248409, at *7 (S.D. Fla. May 15, 2018) (distinguishing between claims based on "a separate duty owed by the defendant to the individual plaintiff under contractual or statutory mandates[]" and dismissing as derivative claims where plaintiffs "have not alleged a special injury, separate and distinct from those sustained by other limited partners."). Plaintiffs respond that *Daccache* is not binding and is based upon Florida law's requirement of a "special injury." (Doc. 102 at 28.) They argue that their aiding and abetting and civil conspiracy claims are not derivative but rather based on "an independent legal duty [PUB] owed directly to Plaintiffs, rather than any of the Jay Peak entities." (Doc. 102 at 29.)

For purposes of analyzing whether a claim is derivative or direct, the courts employ the same standards for limited partnerships that apply to corporations. *See Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 621 (2d Cir. 2012) ("[T]he determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases.") (internal quotation marks omitted). Although Vermont law recognizes circumstances in which a limited partner may assert a derivative claim, *see* 11 V.S.A. §§ 3491, 3493, Plaintiffs do not claim that status here.

"To have standing to sue individually, [a] shareholder must allege an injury separate and distinct from other shareholders, or a wrong involving a contractual right of the shareholder that exists independently of any right of the corporation." *Bovee v. Lyndonville Sav. Bank & Tr. Co.*, 811 A.2d 143, 145-46 (Vt. 2002). In *Bovee*, the Vermont Supreme Court cited Delaware law which holds that a court should examine "[w]ho suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy[.]" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004). In *Bovee*, the plaintiff-shareholders alleged that a bank committed a breach of contract by "violating 'agreements between plaintiffs as shareholders of the bank,' thereby depriving them of information necessary to make informed decisions about their investments in the

bank, and 'depriving them of the full value of their investment.'" *Bovee*, 811 A.2d at
146. The Vermont Supreme Court called the claim "patently derivative[]" because
"[a]ctions charging mismanagement which depress[] the value of stock [allege] a wrong
to the corporation; *i.e.*, the stockholders collectively[.]" *Id.* (internal quotation marks
omitted).

In their aiding and abetting and civil conspiracy claims, Plaintiffs similarly allege
wrongdoing by PUB that, if proven, affected each investor in the Limited Partnerships in
the same manner. For these claims, like the plaintiffs in *Bovee*, Plaintiffs allege no
contractual or statutory duties or individualized harm that is any way "separate and
distinct" from that suffered by all other investors. *Id.* With regard to their aiding and
abetting and civil conspiracy claims, Plaintiffs have thus failed to allege individualized
harm that is independent of and different from the harm suffered by the Limited
Partnership and the investors therein.

Contrary to Plaintiffs' contention, the operative test is not whether Plaintiffs each
suffered a direct loss; instead the "test requires the court to compare the individual
plaintiff's alleged injury to injuries suffered by the other members or shareholders of the
company and then determine whether the plaintiff's injury is separate and distinct from
other members or shareholders." *Triton II, LLC v. Randazzo*, 2019 WL 1777726, at *7
(S.D. Fla. Apr. 23, 2019) (internal quotation marks omitted). As a result, "a plaintiff
must allege more than an injury resulting from a wrong to the [limited partnership,] . . .
he must be injured directly or independently of the [limited partnership]." *In re
Ionosphere Clubs, Inc.*, 17 F.3d 600, 606 (2d Cir. 1994) (applying Delaware law)
(internal quotation marks omitted). "Indeed, if the only injury to an investor is the
indirect harm which consists of the diminution in the value of his or her [investment], the
suit must be derivative." *In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *6
(S.D.N.Y. Jan. 17, 2006) (internal quotation marks omitted); *see also Bovee*, 811 A.2d at
146 (holding that a claim that alleges defendants' wrongdoing depressed the value of the
corporation's stock was "patently derivative.").

In their aiding and abetting and civil conspiracy claims, Plaintiffs allege no injuries distinct from other investors or the Limited Partnerships themselves. They allege no individualized duties owed specifically to them and no wrongdoing inflicted only upon them. Their claims are thus derivative.

For the reasons stated above, PUB's motion to dismiss Counts II, III, VI, and VII of the AC as derivative is GRANTED. Because the court finds that Plaintiffs' aiding and abetting and civil conspiracy claims must be dismissed as derivative, it does not address PUB's further argument that each claim fails to plausibly state a claim for which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).

## LEAVE TO AMEND

Plaintiffs have previously amended their claims and do not affirmatively seek another opportunity to do so. Although leave to amend must be freely granted, Fed. R. Civ. P. 15, the court may deny leave to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In light of Plaintiffs' previous opportunities to amend, the court does not grant leave to amend *sua sponte*. Plaintiffs may nonetheless petition the court for leave to amend within twenty (20) days of the date of this Opinion and Order pursuant Fed. R. Civ. P. 15.

## CONCLUSION

For the foregoing reasons, PUB's motion for sanctions is DENIED. (Doc. 90.) The motion to dismiss filed by the Law Firm Defendants is GRANTED (Doc. 86) and the AC against those Defendants is DISMISSED.

PUB's motion to dismiss is GRANTED IN PART and DENIED IN PART. (Doc. 85.) PUB's motion is DENIED on standing grounds. The motion is GRANTED as to Count II (aiding and abetting fraud) and DENIED for Plaintiffs' remaining claims insofar as PUB seeks dismissal for failure to plausibly plead causation. PUB's motion to dismiss is DENIED on statute of limitations grounds but GRANTED with regard to Plaintiffs'

claim for fraudulent concealment.  It is GRANTED as to Plaintiff Calderwood's claim for breach of fiduciary duty insofar as it depends on a written escrow agreement, but it is DENIED as to the extent PUB seeks dismissal of Plaintiff Calderwood's claim for breach of fiduciary duty based on an implied contract claim.  The motion to dismiss is DENIED as to breach of fiduciary duty in Count I for all other Plaintiffs.  PUB's motion to dismiss is GRANTED as to Count II (aiding and abetting fraud – PUB), Count III (aiding and abetting breach of fiduciary duty – PUB), Count VI (civil conspiracy – all Defendants), and VII (aiding and abetting a violation of V.S.A. ch. 63 – all Defendants) on the grounds those claims are derivative.  Plaintiffs may petition for leave to amend within twenty (20) days of the date of this Opinion and Order and pursuant to Fed. R. Civ. P. 15.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 30th day of April, 2020.

*/s/ Christina Reiss*

Christina Reiss, District Judge
United States District Court