**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| ALMASOOD QURESHI, ALEXANDRE DACCACHE, CARLOS ENRIQUE HILLER SANCHEZ, PHILLIP CALDERWOOD, JOSE ANTONIO PIETRI, JOSE R. CASSERES-PINTO, and TONGYI WANG, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> PEOPLE'S UNITED FINANCIAL, INC., as successor-in-interest to Chittenden Trust Company; PEOPLE'S UNITED BANK; MITCHELL SILBERBERG & KNUPP, LLP, as successor-in-interest to RICHARDSON & PATEL, LLP; MITCHELL SILBERBERG & KNUPP, LLP; DAVID B. GORDON; and DAVID B. GORDON, A PROFESSIONAL CORPORATION, <br><br> Defendants. | Docket No.: 2:18-cv-163 <br><br> **CLASS ACTION** <br> **JURY DEMAND** |

**PLAINTIFFS' MOTION TO DISMISS DEFENDANT**
**PEOPLE'S UNITED BANK'S COUNTERCLAIMS (DE 123)**

On April 30, 2020, this Court denied Defendant People's United Bank's ("PUB") motion to dismiss Plaintiffs' claims for breach of fiduciary duty, recognizing that Plaintiffs had plausibly alleged the existence and breach of fiduciary duties stemming from Plaintiffs' escrow relationship with PUB. (DE 121 at 27; *see also Qureshi v. People's United Bank*, 2020 WL 2079922 (D. Vt. 2020)). In response, PUB has counterclaimed against Plaintiffs, asserting a right to be indemnified by each Plaintiff, as well as claiming fraudulent inducement against Plaintiff Hiller.

None of PUB's counterclaims have merit. As to indemnification, PUB omits any reference to key provisions of the contracts it relies upon that, on their face, demonstrate that PUB's claims are barred. While PUB quotes generic indemnification provisions that do not apply to its counterclaims, PUB fails to attach the contracts, and then ignores the provisions expressly

providing that "in litigation in connection with this Agreement . . . this indemnification obligation shall not apply to any litigation in which relief is sought for the negligence or misconduct of [PUB]." PUB also fails to allege the facts necessary to support its indemnification claims, and its fraudulent inducement claim is ultimately based on nothing more than using interchangeably the SEC-defined term "accredited investor" and the generic contractual term "qualified investor" to manufacture a misrepresentation that does not exist.

The Court should dismiss each of PUB's counterclaims for failure to state a claim.

## BACKGROUND

The investors in Ariel Quiros's Jay Peak scheme — including Plaintiffs — are victims of a $400 million Ponzi-like fraud. Quiros, the scheme's mastermind, and his co-conspirators were indicted on May 21, 2019 for their roles in the scheme. *See USA v. Quiros*, No. 19-cr-76 (D. Vt.).

The essential role that PUB played in the fraud has been litigated since 2016. Plaintiffs have maintained throughout this litigation that PUB, as an escrow agent, entered into a fiduciary relationship with each Plaintiff, and that it disregarded its fiduciary obligations to investors because it cared more for its larger, long-term client Jay Peak. At least one PUB employee admitted that she "considered the [escrow] account [as] belonging to Jay Peak, not to the investor . . . [PUB] considered the investors to be a third party." (DE 78 – Plaintiffs' Am. Compl. ¶ 139). The same PUB employee acknowledged that investor funds were being held in escrow "for the benefit of the investors," but admitted that "we really didn't consider[] it under [the Escrow Agreement's] terms. . . . We considered, once it went into the Jay Peak account, it belonged to Jay Peak." *Id.*

Plaintiffs have further alleged that, once Quiros purchased the Jay Peak resort — and in the years that followed — PUB received from investors and Jay Peak associates compelling evidence of fraud by Jay Peak's principals. Despite its fiduciary duties to investors as their escrow

agent, and despite extensive evidence that Quiros and the Jay Peak entities were engaging in a scheme to defraud those investors, PUB nonetheless executed millions of dollars in circular transactions in violation of money laundering guidelines, actively concealed evidence of Quiros's fraud from investors, and declined to close the misused escrow accounts until the SEC finally froze them in April 2016.

Plaintiffs initiated this action on behalf of themselves and a putative class of hundreds of Jay Peak investors. In connection with their respective investments, Plaintiffs Qureshi, Daccache, Hiller, Pietri, Casseres Pinto, and Wang entered into written escrow agreements with PUB. Those agreements, the "Escrow Agreements," are attached as Exhibits 1 (Qureshi), 2 (Daccache), 3 (Hiller), 4 (Pietri), 5 (Casseres Pinto), and 6 (Wang).[1]

The Escrow Agreements contain two indemnification provisions: the first generic in nature, and the second specifically covering disputes between the parties.

PUB invokes only the first provision, found at paragraph 6(b) under the heading "Duties and Responsibilities of Escrow Agent," which provides:

> (b) The Limited Partnership and the Investor shall jointly and severally indemnify and hold harmless the Escrow Agent against any loss, damage or liability, including, without limitation, reasonable attorney's fees[2] which may be incurred by the Escrow Agent in connection with this Agreement, except any such loss, damage

---

[1] "On a motion to dismiss, the court may consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (holding district court properly considered on a motion to dismiss contracts that were "integral" to the claims but not attached to the complaint) (internal quotations and alterations omitted); *see also Russo v. Navient Solutions, LLC*, 2018 WL 1474354, at *4–*5 (D. Vt. Mar. 23, 2018) (on 12(b)(6) motion, considering documents not attached but heavily referred to in complaint as no one contested documents' authenticity). This Court may consider the Escrow Agreements because they are incorporated by reference in the Counterclaims. *See* Counterclaim ¶¶ 11, 17, 23, 38, 44, 50.

[2] Plaintiff Daccache's escrow agreement (Ex. 2) omits the word "reasonable" before "attorney's fees". In all other respects this Paragraph 6(b) of his escrow agreement is identical to the other Plaintiffs.

or liability incurred by reason of the negligence or misconduct of the Escrow Agent.

*See* Exs. 1–6 ¶ 6(b). PUB omits any mention of the second provision, found at paragraph 7(b) under the heading "Rights of Escrow Agent Upon Dispute," which provides:

> (b) *In the event Escrow Agent becomes involved in litigation in connection with this Agreement*, the Investor and Limited Partnership agree to jointly and severally indemnify and hold the Escrow Agent harmless from all losses, costs, damages, expenses, liabilities, judgments and reasonable attorney's fees suffered or incurred by Escrow Agent as a result thereof, except that ***this indemnity obligation shall not apply to any litigation in which relief is sought for the negligence or misconduct of the Escrow Agent.***

*Id.* ¶ 7(b) (emphasis added). Paragraph 7(b) explicitly disclaims any indemnity obligation where a plaintiff seeks relief for PUB's negligence or misconduct.

On April 30, 2020, the Court denied PUB's motion to dismiss Plaintiffs' claims for breach of fiduciary duty, recognizing that Plaintiffs had plausibly alleged the existence and breach of fiduciary duties stemming from Plaintiffs' escrow relationship with PUB:

> In the AC, Plaintiffs allege that PUB, contemporaneous with its status as an escrow agent, failed to disclose known fraud, commingled funds, improperly released funds from escrow, and failed to investigate facts that, if disclosed, would have protected investors from harm. If established, these facts plausibly allege a breach of fiduciary duty to disclose known fraud because "[t]he test of liability for failure to disclose facts material to the transaction is some duty, legal or equitable, arising from the relations of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge.

(DE 121 at 28) (internal citations omitted). While it is not disputed that Plaintiff Calderwood had no written escrow agreement with PUB, the Court concluded that he had also plausibly alleged a breach of fiduciary duty "[b]ecause Plaintiff Calderwood plausibly alleges an implied contract pursuant to which PUB agreed to act as his escrow agent." *Id.* at 29–30.

On May 28, 2020, PUB counterclaimed against Plaintiffs. (DE 123). Counts I, II, III, V, VI and VII seek indemnification from those Plaintiffs with written escrow agreements, and are materially identical. PUB alleges that:

4

- Each of Plaintiffs Qureshi (Count I), Daccache (Count II), Hiller (Count III), Pietri (Count V), Casseres Pinto (Count VI), and Wang (Count VII) entered into a written escrow agreement with PUB, *see* Counterclaims ¶¶ 9–10, 15–16, 21–22, 36–37, 42–43, 48–49;

- Paragraph 6(b) of each agreement provides the relevant indemnity language, *see id.* ¶¶ 11, 17, 23, 38, 44, 50; and

- PUB has incurred damages pursuant to the written agreement, so Plaintiffs are contractually obligated to indemnify PUB, *see id.* ¶¶ 12–14, 18–20, 24–26, 39–41, 45–47, 51–53.

In support of its allegations, PUB refers to Paragraph 6(b), the generic indemnification provision of the Escrow Agreements described above. PUB does not mention paragraph 7(b), which *explicitly disclaims all indemnification obligations* where PUB "becomes involved in litigation in connection with this Agreement"; nor does PUB give the Court notice of the litigation-specific provision by attaching a copy of the Escrow Agreements.

While Plaintiff Calderwood did not enter into a written agreement with PUB, Count IV of PUB's Counterclaims nonetheless seeks indemnification from him on the ground that his implied contract with PUB must include an implied indemnification provision equivalent to paragraph 6(b) of the Escrow Agreements. *See id.* ¶¶ 27–35. PUB does not state whether the litigation-specific paragraph 7(b) is also implied.

PUB finally alleges, in Count VIII, that Plaintiff Hiller made misrepresentations to third parties in connection with his investment, and that those misrepresentations induced PUB to enter into its written escrow agreement with him. PUB fails to allege any misrepresentations made directly by Plaintiff Hiller to PUB. PUB alleges that as a result of Hiller's misrepresentations, PUB is entitled to rescission of the Hiller Escrow Agreement. *See id.* ¶ 93.

None of PUB's claims have merit. For the reasons set forth below, each of PUB's counterclaims should be dismissed. Because amendment would be futile, dismissal with prejudice

5

is appropriate.

## ARGUMENT

I.     **PUB FAILS TO STATE COUNTERCLAIMS FOR INDEMNIFICATION.**

The indemnification claims should be dismissed for four reasons. First, the contractual indemnification claims are barred as a matter of law by the specific provision in the Escrow Agreements that relieves Plaintiffs of any duty to indemnify PUB for losses incurred defending against claims alleging negligence or misconduct by PUB. Second, even the indemnification provision relied upon by PUB does not specifically permit the recovery of attorney's fees between the contracting parties, so the American Rule bars PUB's claim for fees against the Plaintiffs. Third, the contractual indemnification claims fail to state a claim. Finally, the allegations in the Counterclaim foreclose the implied indemnification claim against Calderwood as a matter of law.

A.     **PUB is not entitled to indemnification for Plaintiffs' lawsuits alleging misconduct in connection with the Escrow Agreements.**

PUB alleges it is entitled to indemnification from Plaintiffs for "losses, damages and attorney's fees" incurred "as a result of disputes concerning" the Escrow Agreements. (*See* Counterclaims ¶¶ 11-12, 17-18, 23-24, 38-39, 44-45, 50-51). PUB's claims are barred, however, because PUB relies on the inapplicable, generic Paragraph 6(b) even as the plain language of the applicable, litigation-specific Paragraph 7(b) disclaims any indemnity obligations where Plaintiffs, as here, have alleged negligence or misconduct.

Where a written agreement contains both general and specific provisions covering the same subject matter, it is a bedrock principal of contract law that only the more specific provision applies. See *Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 439 (1995) ("As a matter of contract construction, the specific controls the general."). Because "[i]t is hornbook law that construction of contract terms is a matter of law and not a factual

determination," *Ianelli v. Standish*, 156 Vt. 386, 389 (1991), this Court may resolve on a motion to dismiss whether the specific indemnification clause of the Escrow Agreements controls, rather than the general indemnification clause relied upon by PUB.³

PUB bases Counterclaims I, II, III, V, VI and VII on the generic indemnification provision at Paragraph 6(b), which makes no reference to any dispute or litigation. Because there is a second indemnification provision at Paragraph 7(b) that specifically controls "litigation in connection with this Agreement," the more generic provision cannot be given effect. To conclude otherwise would not "give effect to every part and form a harmonious whole from the parts of a contract." *R & G Properties, Inc. v. Column Fin., Inc.*, 184 Vt. 494, 504 (2008); *see also Post v. Killington, Ltd.*, No. 5:07-CV-252, 2010 WL 3323659, at *7 (D. Vt. May 17, 2010) ("'nonsensical' interpretations of contracts are disfavored because people are unlikely to make contracts with absurd consequences") (citing *State v. Philip Morris USA Inc.*, 183 Vt. 176, 185 (2008)).

PUB's contractual indemnification claims, like this litigation, fall squarely within the scope of Paragraph 7(b). The only "losses, damages and attorney's fees" PUB has allegedly "incurred, and continues to incur," are "a result of disputes concerning" the Escrow Agreements. *See* Counterclaims ¶¶ 12, 18, 24, 39, 45, 51.

PUB fails to plead any facts regarding the nature of the "disputes" that trigger its alleged indemnification rights. Because PUB asserted its right to indemnification as counterclaims to the Amended Complaint, the "disputes" PUB refers to are Plaintiffs' claims against it, seeking relief

---

³ Any ambiguity as to whether Paragraph 7(b) is more specific than Paragraph 6(b) must be construed against PUB as the drafter of the Escrow Agreements. *See State v. Spitsyn*, 174 Vt. 545, 547 (2002) ("[W]here a contract is ambiguous, it will be construed against the party who drafted it"). PUB admits that it drafted the Escrow Agreements. (*See* Counterclaim ¶ 31 (alleging "PUB's standard escrow agreement language relating [*sic*] Jay Peak" included indemnification provisions)).

from PUB for its misconduct in connection with the Jay Peak scheme — including breaches of duties arising under the Escrow Agreements. As this Court observed, "Plaintiffs allege that PUB, contemporaneous with its status as an escrow agent, failed to disclose known fraud, commingled funds, improperly released funds from escrow, and failed to investigate facts that, if disclosed, would have protected investors from harm." (DE 121 at 28).

The controlling indemnification provision, Paragraph 7(b), explicitly disclaims any indemnity obligation where, as here, there is "any litigation in which relief is sought for the negligence or misconduct of [PUB]." Under that provision's plain language, it is simply not permissible for PUB to seek indemnification from Plaintiffs, who have indisputably sought relief for PUB's "negligence or misconduct" in this action.[4]

**B.     PUB's claims for indemnification should be dismissed as an improper attempt to circumvent the American Rule.**

PUB alleges that it is entitled to recover attorney's fees "as a result of disputes concerning the . . . [Plaintiffs'] Escrow Agreement[s]." Counterclaim ¶¶ 12, 18, 24, 33, 29, 45, 51. The Counterclaim refers to no other dispute besides this litigation. PUB refers to no clause other than Paragraph 6(b) in the Escrow Agreements of six Plaintiffs. *See id.* ¶¶ 11, 17, 23, 28, 44, 50. In the case of Plaintiff Calderwood, PUB refers to no contractual provision at all.

Vermont courts adhere to the "American Rule," pursuant to which litigants must bear their own attorney's fees absent a contractual or statutory exception, proof of which is "demanding" according to the Vermont Supreme Court. *See Sachs v. Downs Rachlin Martin PLLC*, 206 Vt. 157,

---

[4] Even if the Court were to apply the general indemnity clause in Paragraph 6(b), notwithstanding the more specific clause in Paragraph 7(b), dismissal is nonetheless required under Vermont law which provides that an indemnitee cannot seek indemnification for a claim based upon the indemnitee's misconduct unless the indemnification provision specifically permits indemnification regardless of the fault of the indemnitee. *See Tateosian v. State*, 183 Vt. 57, 67 (2007) ("we adopt the general rule that an indemnity clause covers the sole negligence of the indemnitee only where it clearly expresses that intent.").

171 (2017); *see also Fletcher Hill v. Crosbie*, 178 Vt. 77, 79 (2005) (fee-shifting only to the extent contract specifically permits same); *Bruntaeger v. Zeller*, 147 Vt. 247, 255 (1986) (fee-shifting statute must be strictly construed). The American Rule is also applicable to claims for fees pursuant to an indemnification clause. *See, e.g.*, *Southwick v. City of Rutland*, 190 Vt. 324, 327–28 (2011).

Because Paragraph 6(b) does not specifically permit PUB to recover fees for defending Plaintiffs' claims, PUB's Counterclaim for indemnification should be dismissed based upon Vermont's strict adherence to the American Rule.

"Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise." *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (N.Y. 1989). There is no such language in Paragraph 6(b).

Further, construing Paragraph 6(b) to permit PUB to recover its fees could lead to an absurd result inconsistent with the American Rule. According to the Escrow Agreements, PUB is entitled to indemnification under Paragraph 6(b) if it sustains any liabilities and losses "in connection with this Agreement." If this language were applied to Plaintiffs' claims, PUB could misuse Paragraph 6(b) to require Plaintiffs to satisfy a judgment against PUB and to pay PUB its legal fees in this action.

To avoid such results, "where a general indemnification provision does not explicitly provide for indemnification for suits *between* the parties to the contract, a claim for such indemnification must fail." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.,* 667 F. Supp. 2d 308, 329 (S.D.N.Y. 2009) (emphasis in original). Paragraph 6(b) does not explicitly provide for

indemnification for suits between Plaintiffs and PUB, so PUB's claims for indemnification from Plaintiffs must fail.

C. **The Counterclaim does not plead facts sufficient to state claims for indemnification.**

Under Vermont law, "in contractual indemnity situations, an indemnitor's obligation to defend should be determined at the beginning of the case based on the pleadings." *Tateosian*, 183 Vt. at 63. To a state a claim for contractual indemnification, the purported indemnitee must plead facts showing it has incurred or will incur losses that fall within the scope of the indemnification agreement. *See Corbeil v. Blood*, No. 5:10-CV-56, 2011 WL 2270403, at *3-4 (D. Vt. June 6, 2011) (dismissing contractual indemnification claim where the allegations did not show that any losses would arise out of the conduct covered by the indemnification clause).

Even if the Court were to conclude that PUB's counterclaims for express indemnification were governed by paragraph 6(b) of the Escrow Agreements as PUB asserts, the claims would still be subject to dismissal as a matter of law because PUB has failed to plead the facts necessary to support the claim. To show a right to indemnification under paragraph 6(b), PUB is required to allege facts related to the nature of its actual or potential losses and their relationship to the Escrow Agreement.

But PUB pleads no facts describing the nature of — or even the other parties involved in — the "disputes concerning" the Escrow Agreements that caused, and continue to cause, it to incur undefined "losses, damages and attorney's fees." *See* Counterclaim ¶¶ 12, 18, 24, 39, 45, 51. Because the Counterclaim is devoid of such facts, PUB's allegations that its damages are "not the result of any negligence or misconduct of PUB," *see id.* ¶¶ 13, 19, 25, 40, 46, 52, represent nothing more than legal conclusions couched as factual allegations that this Court is not bound to accept as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Likewise, PUB's conclusory allegations that it incurred "losses, damages and attorney's fees" is not enough to a state a claim

for relief. Accordingly, the Court should dismiss the contractual indemnification claims.

**D.     PUB fails to state a claim for implied indemnification against Calderwood.**

PUB alleges that it is entitled to indemnification from Plaintiff Calderwood because, to the extent the Court determines there is an implied contractual agreement between it and him, that implied agreement must include the indemnification provisions found in the written Escrow Agreements. *See* Counterclaim ¶¶ 27–35.  PUB's novel theory of indemnity finds no support in Vermont law.

First, while this Court has already held that "Plaintiff Calderwood plausibly alleges an implied contract pursuant to which PUB agreed to act as his escrow agent"  (DE 121, at 30), PUB has failed to plausibly allege an implied in fact contract pursuant to which Calderwood agreed to indemnify PUB. Absent specific allegations that Plaintiff Calderwood intended to indemnify PUB and demonstrated that intent, PUB's claim for implied indemnification cannot survive a motion to dismiss under an implied in fact contract theory.  *See Mount Snow Ltd. v. ALLI, the All. of Action Sports*, No. 1:12-CV-22-JGM, 2013 WL 4498816, at *8 (D. Vt. Aug. 21, 2013) ("To prevail on a contract implied in fact claim, a plaintiff must demonstrate ***mutual intent to contract*** and acceptance of the offer.") (emphasis added).

Second, PUB has also failed to plausibly allege an indemnification claim against Calderwood under an implied in law theory of contract. "Vermont recognizes a right of indemnity if: (1) there is an express agreement by one party to indemnify the other, or (2) the circumstances are such that the law will imply such an undertaking." *Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 894 F. Supp. 777, 786 (D. Vt. 1995) (internal quotations and citations omitted). Because PUB admits there is no express agreement between it and Calderwood, *see* Counterclaim ¶¶ 27–28, the indemnification claim against Calderwood must be construed only as an implied indemnification claim. *See Loli of Vermont, Inc. v. Stefandl*, 968 F.

11

Supp. 158, 161 (D. Vt. 1997) (explaining where "there has been no express agreement to indemnify[,] the issue is whether a right of indemnity may be implied from the circumstances").

"Implied indemnity is a right accruing to a party who, without active fault, has been compelled by some legal obligation, such as a finding of vicarious liability, to pay damages occasioned by the negligence of another." *City of Burlington v. Arthur J. Gallagher & Co.*, 173 Vt. 484, 486 (2001). But implied indemnification is "appropriate only when the indemnitee is vicariously or secondarily liable to a third person because of some legal relationship with that person or because of the indemnitee's failure to discover a dangerous condition caused by the act of the indemnitor, who is primarily responsible for the condition." *White v. Quechee Lakes Landowners' Ass'n, Inc.*, 170 Vt. 25, 29 (1999), *followed in Hemond v. Frontier Commc'ns of Am., Inc.*, 199 Vt. 259, 263 (2015).

In other words, implied indemnification would only be available to PUB if it sought to recover damages paid to a third person who was injured primarily by Plaintiff Calderwood's negligence. But it is undisputed that such is not the case here: PUB does not allege that it was forced to pay damages to a third party because of Calderwood's negligence. Rather, PUB claims that it "has incurred loss, damage and liability, including attorney's fees, arising out of Calderwood's claim that he and PUB had an escrow agreement." *See* Counterclaim ¶ 33. There is no plausible reading of PUB's allegations that supports characterizing "Calderwood's claim that he and PUB had an escrow agreement" as negligence, let alone negligence that caused PUB to pay unknown damages to an unidentified third party. Accordingly, PUB is not entitled to implied indemnification from Calderwood and the Court should dismiss the claim against him.

## II. **PUB'S COUNTERCLAIM FOR FRAUD IN THE INDUCEMENT AGAINST HILLER SHOULD BE DISMISSED.**

PUB's Counterclaim against Hiller should be dismissed for three reasons. First, PUB cannot rely on purported misrepresentations regarding Hiller's status as an "accredited investor" that were made to third parties, and PUB does not allege any false representation of fact made to it directly. Second, PUB fails to allege that any representation made by Hiller was the proximate cause of its alleged loss. Third, PUB's allegations, taken as true, show that it cannot obtain the remedy of rescission because it already released Hiller's funds to the Phase VII Limited Partnership and thus the parties cannot be restored to the position they were in before PUB wrongfully released the escrowed funds.

**A.  PUB cannot rely on statements made to third parties and does not allege any misrepresentation made to PUB directly.**

Under Vermont law, fraud in the inducement is "an intentional misrepresentation of fact affecting the essence of the transaction, false when made and known to be false by the maker, not open to the defrauded party's knowledge, and relied upon by the defrauded party to its damage." *Von Turkovich v. APC Capital Partners, LLC*, 259 F. Supp. 2d 314, 321 (D. Vt. 2003). "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Twombly*, 550 U.S. 544).

A party alleging fraudulent inducement must meet the heightened standards for pleading fraud as laid out in Rule 9(b). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Citibank N.A. v. City of Burlington*, 971 F. Supp. 2d 414, 430 (D. Vt. 2013). Rule 9(b) requires that a pleading "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent." *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

In its Counterclaim, PUB cites to statements made in the Offering Memorandum for Phase VII, which provides that the offering is made only to "accredited investors" as defined in Rule 501(a) of Regulation D. *See* Counterclaim ¶¶ 55–58. PUB then alleges that Hiller purportedly made misrepresentations — which PUB "reasonably relied upon" to enter into the Hiller Escrow Agreement, *id.* ¶ 67 — in the Investor Questionnaire, *id.* ¶¶ 68–72, the Subscription Agreement, *id.* ¶¶ 73–79), and the Phase VII Limited Partnership Agreement, *id.* ¶¶ 80–84.

Even assuming these allegations were true, however, it is undisputed that these statements were made to the Phase VII Limited Partnership — not to PUB. Nor has PUB alleged that Hiller intended these representations to be communicated by the Phase VII Limited Partnership to PUB. PUB's claim cannot stand absent such allegations. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 412 F. Supp. 3d 392, 410–11 (S.D.N.Y. 2019) (for a plaintiff to have reasonably relied on statements communicated through a third party, defendant must have intended for the misrepresentations to be communicated by the third party to plaintiff). PUB likewise cannot rely on statements purportedly made by Hiller in his I-526 filed with the U.S. Department of Homeland Security Citizenship and Immigration Services. *See* Counterclaim ¶¶ 86–89.

The single purported representation that PUB alleges was made by Hiller directly to PUB is the recitation in Hiller's Escrow Agreement that he was a "bona fide, *qualified investor* seeking to invest in the Offering." *Id.* ¶¶ 64–67 (emphasis added). But the term "qualified investor" is not defined in the Escrow Agreement. PUB uses the term "qualified investor" interchangeably with the term "accredited investor" to suggest that they have the same meaning, but there is no reference to the term "qualified investor" in Rule 501(a) of the Securities Act of 1933. And while the term

"qualified immigrant" appears in the statute governing the allocation of visas, 8 USC § 1153(b)(5), it has nothing to do with the "accredited investor" standard under the securities laws. As PUB fails to allege a misrepresentation of fact — that Hiller was not a "qualified investor" — PUB has not alleged fraud against Hiller.

In addition, PUB alleges that Hiller misrepresented his net worth and income in his Investor Questionnaire submitted to the Phase VII Limited Partnership. *See* Counterclaim ¶¶ 68–72.[5] In the questionnaire, Hiller hand-wrote that his net worth was $600,00 and that his income in the most recent two years did not exceed $200,000. As Hiller disclosed that his net worth and income were well under the amounts required for "accredited investor" status, it was open and obvious to PUB that Hiller was not an "accredited investor" under the securities laws. *See Von Turkovich*, 259 F. Supp. 2d at 321 (third element of fraud is that falsity of misrepresentation must be "not open to the defrauded party's knowledge"); *see also Felis v. Downs Rachlin Martin PLLC*, 200 Vt. 465, 472 (2015) (as claimant's allegations indicated that allegedly fraudulent billing practices were known to him from the outset, his alleged claim was non-actionable based upon third element required to establish fraud).

**B.     PUB does not allege that any representation made by Hiller was the proximate cause of its alleged loss.**

PUB also fails to allege loss causation as part of its claim for fraudulent inducement. While PUB alleges generally that "[a]bsent Hiller's fraudulent representations concerning his net worth and/or income level, the parties would not have entered into the Hiller Escrow Agreement," *see*

---

[5] As PUB repeatedly references the questionnaire in its Counterclaim, *see id.* ¶¶ 68–72, Plaintiff Hiller requests that the Court consider this document on the motion to dismiss and what he actually wrote in the questionnaire. *See supra* at 3 n.1. Because the questionnaire contains sensitive information and has been designated confidential, Plaintiffs will seek leave to file the document under seal.

Counterclaim ¶ 91, this is an allegation of transaction causation — not loss causation. As this Court has already reasoned:

> Transaction causation requires a plaintiff to plausibly allege that they "would not have invested ... *but for* Defendants' misrepresentations." In contrast, loss causation requires a plaintiff to allege a "fraudulent statement that induced [the plaintiff] to invest [that] ... made her investment, in fact, more disposed to suffer the alleged harm[ ] ... than honestly described alternative investments." In other words, a plaintiff must allege how his investment was damaged by the fraud in comparison to what it would be worth in its absence. If the value of the investment decreased for other reasons, that amount is not included in loss causation.

*Qureshi*, 2020 WL 2079922, at *12 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160, 186 (2d Cir. 2015)).

Loss causation must be pled in fraud cases, even when seeking only recession. *See, e.g.*, *Loreley,* 412 F. Supp. 3d at 412 (holding that plaintiffs failed to establish loss causation and could not prevail on their fraud claim for damages, since they could not prove that any misrepresentations caused their losses, and so plaintiff's rescission claim also failed since they cannot prove the elements of common law fraud (citing *Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 445 (2d Cir. 2008) (dismissing rescission claim for failure to plead loss causation))).

The Supreme Court of Vermont has recognized that the requirement of loss causation "is simply that of causation," as "a defendant's tort cannot be considered the legal cause of plaintiff's damage, if that damage would have occurred just the same even though defendant's tort had never been committed." *Perkins v. Vermont Hydro-Elec. Corp.*, 106 Vt. 367, 177 A. 631, 636 (1934) (citing Prof. Jeremiah Smith, "Legal Cause in Actions of Tort," 25 Harv. Law Rev. 303, 312).

Here, PUB fails to allege how any representation by Hiller that he was an "accredited investor" or a "bona fide, qualified investor" was the cause of any loss suffered by PUB. While PUB alleges transaction causation, that PUB would not have entered into the transaction but for these representations, it fails to allege loss causation.

In *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87 (2d Cir. 2007), the court found that plaintiff failed to allege how the defendant's alleged fraudulent misrepresentation that it was an "accredited investor" caused its loss, stating:

> ATSI also claims that the representation in the Securities Purchase Agreement that the Shaar Fund was an accredited investor was fraudulent. *The complaint does not sufficiently allege loss causation with respect to this misrepresentation.*
>
> ATSI contends that it adequately pled loss causation because the Levinson Defendants made this misrepresentation to induce ATSI to enter into the transaction under the pretense that they were "trustworthy, reputable and long-term investor[s]," and that when the true risk of their plans materialized through their manipulative acts, ATSI suffered losses. *This allegation might support transaction causation; it fails, however, to show how the fact that the Shaar Fund was not an accredited investor caused any loss.*

*Id.* at 106–07 (emphasis added). PUB's claim against Hiller for fraudulent inducement suffers from the same infirmity, and should be dismissed.

**C.  The facts alleged by PUB establish that it is not entitled to rescission in that it already released Hiller's funds to the Phase VII Limited Partnership and thus is unable to restore Hiller to his original position.**

Finally, although PUB seeks rescission in its Counterclaim against Hiller, its allegations show that PUB cannot restore Hiller to the position he was in before PUB released his escrowed funds. "It is a common principle, that when one has a right to rescind a contract, and exercises that right, he must restore the other party to the same condition that he would have been in if no contract had been made…." *Downer v. Smith,* 32 Vt. 1, 7 (1859). Further, while "a defrauded party does not lose his right to rescind because the contract has been in part executed, and the parties cannot be fully restored to their former position, … he must rescind as soon as the circumstances will permit; and he cannot go on with the contract after the fraud has been discovered, so as to prejudice the fraudulent party by the rescission being delayed. In other words, if a party rescinds, he must do it with all reasonable dispatch, upon discovering the fraud." *Id.* at

17

7–8; *see also Smith v. Munro,* 134 Vt. 417, 420 (1976) ("Where the parties cannot be placed in status quo, cancellation or rescission is never directed unless demanded by the clearest and strongest equity.").

Here, PUB alleges in Paragraph 92 of its Counterclaim that, absent Hiller's fraudulent representations, Hiller's "escrowed funds would not have been released from escrow," thereby acknowledging that PUB has already released Hiller's funds to the Phase VII Limited Partnership and so cannot restore Hiller to his original position. Further, PUB deposed Hiller on March 14, 2017, in the previously-filed action in the Southern District of Florida, at which time Hiller testified that he did not have the income level or net worth of an "accredited investor," yet PUB did not bring this claim until more than three years later. Under basic principles of equity, PUB's claim for rescission cannot be maintained. *See Bank of New York Co. v. Ne. Bancorp, Inc.,* 9 F.3d 1065, 1067 (2d Cir. 1993) (plaintiff was not entitled to rescission of share transaction where "months have passed since the consummation of the merger, values have changed, and a stock transfer will not restore the three companies to their pre-merger circumstances"; thus where a full restoration of the status quo would not be realistically possible, "it would defy common sense to order it").

## CONCLUSION

Plaintiffs are victims of a $400 million investment fraud. PUB, their fiduciary, now seeks to extract indemnification from Plaintiffs who seek to recover their losses.

PUB's counterclaims are both factually and legally deficient, ignoring contract language that bars PUB's requested relief, and otherwise failing to state a claim under Vermont law.

The Counterclaims must be dismissed. Because amendment would be futile, the counterclaims should be dismissed with prejudice.

Respectfully submitted this 21st day of July, 2020.

By: /s/ Harley S. Tropin, Esq.
Harley S. Tropin, Esq.

| | |
|---|---|
| Harley S. Tropin, Esq.<br>hst@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Tal J. Lifshitz, Esq.<br>tjl@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone: (305) 372-1800<br>Facsimile: (305) 372-3508<br>*Counsel for Plaintiffs* | Paul Aiello<br>paiello@bennettaiello.com<br>Michael P. Bennett<br>mbennett@bennettaiello.com<br>**BENNETT AIELLO**<br>The Ingraham Building, Eighth Floor<br>25 Southeast Second Avenue<br>Miami, Florida 33131<br>Telephone:    (305) 358-9011<br>Facsimile:       (305) 358-9012<br><br>*Counsel for Plaintiffs* |
| Daniel C. Girard<br>dgirard@girardsharp.com<br>Angelica M. Ornelas<br>aornelas@girardsharp.com<br>**GIRARD SHARP LLP**<br>601 California Street, Suite 1400<br>San Francisco, California 94108<br>Phone:  (415) 981-4800 Fax:  (415) 981-4846<br>*Counsel for Plaintiffs* | Lisa B. Shelkrot<br>lshelkrot@langrock.com<br>**LANGROCK SPERRY & WOOL, LLP**<br>210 College Street<br>PO Box 721<br>Burlington, VT 05401<br>Telephone: 802 864-0217<br>*Counsel for Plaintiffs* |

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on this 21st day of July, 2020 and served by the same means on all counsel of record.

By: /s/ Harley S. Tropin, Esq.
Harley S. Tropin, Esq.

11W6735